Christopher **FLOUDIOTIS**, Defendant Below, Appellant,

v.

**STATE** of Delaware, Plaintiff Below, Appellee.

Owen **Carr**, Defendant Below, Appellant,

v.

**State of Delaware**, Plaintiff Below, Appellee.

Brent J. **Eaton**, Defendant Below, Appellant,

v.

**State of Delaware**, Plaintiff Below, Appellee.

Michael **Reynolds**, Defendant Below, Appellant,

v.

**State of Delaware**, Plaintiff Below, Appellee.

**Nos. 436, 1997, 443, 1997, 435, 1997, 440, 1997.**

Supreme Court of Delaware.

Submitted: Feb. 22, 1999.
Decided: April 6, 1999.

---

Kathleen M. Jennings, (argued), Ann–Marie P. Sheely, of Oberly & Jennings, P.A., Wilmington, Delaware, for appellant Floudiotis.

Joseph A. Hurley, (argued), Wilmington, Delaware, for appellant Eaton.

Jerome M. Capone, (argued), Wilmington, Delaware or appellant Carr.

Bernard J. O'Donnell, (argued), Assistant Public Defender, Wilmington, Delaware, for appellant Reynolds.

John Williams, Dover, Delaware; Kim E. Ayvazian, (argued), Sam Glasscock, III, Georgetown; Deputy Attorneys General, Department of Justice, for appellee.

Before VEASEY, Chief Justice, WALSH and HOLLAND, Justices.

VEASEY, Chief Justice:

In this appeal of a joint trial of four co-defendants allegedly involved in an assault and conspiracy, we reverse the judgment of the trial court following a jury verdict against the defendants. We hold, in part, that the trial court committed reversible error in the admission of unfairly prejudicial evidence of marginal relevance against all defendants. This prejudicial evidence included photographs of the defendants' tee-shirts and tattoos and offensive comments attributed to certain defendants, all of which (in varying degrees) tended to depict the defendants as racist in a case where all the defen-

dants and both of the victims were white. Race was not an issue and the evidence was not probative on the identification issue.

In view of the possibility of a new trial, we have expressed our views on other evidentiary issues and the proper procedures for the trial court to employ in determining whether, and to what extent, any retrial that is likely to involve essentially the same complex evidentiary problems among the various defendants will be joint or several.

### Facts

At about 1:15 a.m. on July 16, 1995, Kimberly and Mark Butler exited the Deer Park Tavern. According to the Butlers' testimony at trial, a young white male with a crew cut hairstyle threw beer on Kimberly as Mark began backing his truck out of its parking space in the Deer Park parking lot. Kimberly opened her door and began exiting the vehicle when she was dragged to the ground and beaten to the point of unconsciousness. Mark exited the truck to see what was happening when several young white males suddenly surrounded him and began to beat him. That was his last recollection before losing consciousness. Both Kimberly and Mark suffered serious injuries. Both sustained broken jaws, cuts and bruises, and Mark also sustained a broken collarbone.

The only eyewitness to the actual assault was Augustino Parodi, a musician playing at the Deer Park that night. At trial, Parodi testified that he was stowing his musical equipment in his car in the Deer Park parking lot when he saw a group of six to eight young white males with crew cuts attack a couple walking in the parking lot. He saw one person deliver a flying kick to the back of the male victim followed by everybody in the group participating in the assault by punching and kicking the male victim. At one point, according to Parodi, one of the assailants took a metal object out of a pickup truck and hit the male victim with it. After the attack, Parodi saw some of the young men get into a small light colored car while others entered the pickup truck from which the assailant had taken the metal object. Parodi described this truck as "maybe orange and rusty, kind of tan."

Upon learning of an incident in the parking lot, David Fecak, a Deer Park employee, ran outside. He saw four men standing over a man and a woman, but he did not see any physical violence. Soon after he arrived on the scene, Fecak observed the four men get into a "red maroon-like-rust-colored pickup truck" in the parking lot and leave the scene. As the truck exited the parking lot, Fecak recorded the license plate number and went to aid the Butlers, the man and woman he had observed on the ground.

Corporal Ted Ryser of the Newark Police Department noticed the same pickup truck exiting the Deer Park parking lot and followed it on suspicion of drunken driving. Eventually, he pulled the pickup truck over. In addition to the driver, Michael Reynolds, Corporal Ryser observed three passengers in the truck: Christopher Floudiotis, Owen Carr and Brent Eaton. After obtaining Reynolds' license and registration, Corporal Ryser heard a broadcast on his police radio warning officers to be on the lookout for suspects in the Deer Park assault. The report, using information provided by Fecak, stated that the suspects were driving a pickup truck with a license number matching the license plate of Reynolds' truck. At this point, Corporal Ryser called for backup and two more officers arrived on the scene. Corporal Ryser arrested Reynolds for driving under the influence and transported him to the Newark police station. The other officers transported Floudiotis, Carr and Eaton to the police station in a separate vehicle.

After interviewing the Butlers at the hospital and conferring with officers who had taken statements from witnesses at the Deer Park, Detective Ralph Johnson arrived at the Newark police station to interview the four suspects. At the hospital, Detective Johnson had noted a distinctive imprint on Mark Butler's stomach that appeared to come from the heel of a boot. Realizing that Reynolds and Floudiotis wore heavy combat boots, Detective Johnson directed all four suspects to raise their shoes so that he could observe the patterns on their boots. Detective Johnson immediately noticed a similarity in pattern between the imprint he observed on Mark

Butler's stomach and the pattern on the boots worn by Reynolds and Floudiotis.

After interviewing and photographing them, Detective Johnson seized the footwear of all four suspects even though Carr and Eaton were not wearing combat boots. Detective Johnson testified that he did so because he had reason to believe that all four were involved in the assault at the Deer Park and because he thought that the footwear might contain hairs or fibers that would tie the suspects to the crime. According to his later testimony, however, Detective Johnson did not subjectively believe at the time that he possessed sufficient probable cause to arrest any of the suspects for the assault. Through subsequent forensic tests, the State discovered fibers on Eaton's shoes that were consistent with the same source of the fibers taken from the tank top Kimberly Butler wore the night of the attack.

The police eventually arrested Reynolds, Floudiotis, Carr and Eaton in connection with the assault on the Butlers. The State charged each defendant with one count of First Degree Assault based on the assault of Mark Butler, one count of Second Degree Assault based on the assault of Kimberly Butler and one count of Second Degree Conspiracy. The State chose to prosecute the defendants in a joint trial. The defendants' motions for severance were denied by the trial court.

At trial, the State proceeded on a theory that the defendants were part of a larger group of similarly dressed young men with crew cuts who had gone to the Deer Park on the night in question to drink in memory of a recently deceased mutual friend and to incite a fight. Hoping to connect the defendants to intimidating behavior in the Deer Park prior to the assault as a means of showing a conspiracy, the State called two witnesses to testify to events inside the Deer Park.

Shane Hamby, who is white, was at the Deer Park that evening with his friend Sheila Sainson, who is black. Sainson testified that as she entered the bar that evening, she walked past a group of about eight young men with crew cuts wearing similar clothing when an individual with dark hair and a red dragon tattoo on his arm said something like "I'm going to have some black meat tonight." Hamby testified that he was walking back to his table when he noticed Michael Reynolds, an acquaintance of his, with two other individuals. Hamby said hello to Reynolds when one of the other individuals said something like "who's this geek?" Hamby described this individual as having a red dragon tattoo on his arm and a spiderweb on his shoulder.[1]

At this point, Hamby heard Reynolds tell the person with the tattoo to leave Hamby alone because Reynolds was casually acquainted with him. Soon thereafter, a third individual came up to Hamby and showed him a tattoo on his arm that said "in memory of ..." someone whose name Hamby could not recall.[2] This individual told Hamby that he and his friends were at the Deer Park drinking in memory of one of their friends who had been killed. This individual also said something about "f____ing somebody up."

As a supplement to Hamby's testimony, the State also called Corporal Susan Poley, who interviewed Hamby on the night of the assault. According to her notes, Hamby stated that the individual with the "in memory of ..." tattoo told him that "one of our friends got killed and we are looking to f____k somebody up."

The State's last significant witness was Melissa Aozaman, Floudiotis' ex-girlfriend. She testified that Floudiotis confessed his involvement in the assault to her the day after it occurred. Although Floudiotis told her that the incident began when Carr threw beer on a man getting into his car with a woman, the trial court redacted this testimony to eliminate any reference to any specific defendant other than Floudiotis. Aozaman

---

1. Although neither Hamby nor Sainson identified Eaton as the individual who made these comments, the State argued that Eaton made these comments because he had tattoos that matched both witnesses' recollection.

2. Hamby again could not identify the declarant except for his general physical appearance, but the State argued that this declarant was Floudiotis due to the fact that Floudiotis has an "in memory of Hammer Joe" tattoo on one of his arms.

testified that Floudiotis also told her that he hit the woman when she started screaming.

On July 7, 1997, after two-and-one-half days of deliberation, the jury returned with its verdict. The jury found each of the defendants guilty of Second Degree Conspiracy as well as the lesser included offenses of Second Degree Assault based on the assault of Mark Butler and Third Degree Assault based on the assault of Kimberly Butler.

Additional facts relevant to the disposition of the issues discussed below will be developed in the legal analysis.

### Introduction of Prejudicial Evidence

The defendants contend that the trial court erred in admitting several items of evidence that impermissibly introduced irrelevant racist views of the defendants in a prosecution of crimes not motivated by the victim's race. The Butlers are white and the defendants are white. The defendants argue that any probative value inherent in this admitted evidence was substantially outweighed by the prejudicial impact such evidence of racism would have on a typical jury.

■■■ In cases where a defendant challenges the admissibility of certain evidence, this Court limits itself to determining whether the trial court abused its discretion in admitting the challenged evidence.[3] "An abuse of discretion occurs when 'a court has

... exceeded the bounds of reason in view of the circumstances,' [or] ... so ignored recognized rules of law or practice ... to produce injustice."[4] In reviewing the trial court's evidentiary rulings, we recognize that "the trial judge is in a unique position to evaluate and balance the probative and prejudicial aspects of the evidence."[5]

When determining the admissibility of evidence, the trial court must bear in mind the strictures of the Delaware Rules of Evidence ("D.R.E."). D.R.E. 401, 402 and 403 all address the relevancy of evidence and the court's duty to act as a gatekeeper in its admission or exclusion.[6] D.R.E. 403 in particular requires the trial court to balance the probative value and the prejudicial effect of proffered evidence to determine whether the probative value is substantially outweighed by the danger of unfair prejudice.[7]

■■■ The trial court's duty to balance evidence under D.R.E. 403 becomes especially important when the evidence tends to be racially charged. In past decisions, this Court has carefully reviewed the trial court's rulings in such situations.[8] The improper injection of race as an issue into a criminal proceeding violates a defendant's constitutional right of due process.[9] Racial evidence proffered to establish only a defendant's abstract beliefs or to create a bias against the

---

3. See *Lilly v. State*, Del.Supr., 649 A.2d 1055, 1059 (1994).

4. *Id.* (quoting *Firestone Tire & Rubber Co. v. Adams*, Del.Supr., 541 A.2d 567, 570 (1988)).

5. *Smith v. State*, Del.Supr., 560 A.2d 1004, 1007 (1989).

6. D.R.E. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

 D.R.E. 402 states, in part, that "[e]vidence which is not relevant is not admissible."

 D.R.E. 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice: ...."

7. D.R.E. 403; *See also Hoey v. State*, Del.Supr., 689 A.2d 1177, 1180 (1997); *Moorhead v. State*,

Del.Supr., 638 A.2d 52, 55 (1994). The language of D.R.E. 403 is permissive. As the United States Court of Appeals for the Eighth Circuit commented in reviewing the admissibility of evidence under Federal Rule of Evidence 403 (after which D.R.E. 403 is modeled), "[t]his permissive language is a reminder that when reviewing a Rule 403 determination, our task is not to reweigh the prejudicial and probative elements of the evidence, but rather to determine if the [trial] court clearly abused its discretion in admitting the evidence." *Williams v. Nebraska State Penitentiary*, 8th Cir., 57 F.3d 667, 670 (1995).

8. *See Zebroski v. State*, Del.Supr., 715 A.2d 75 (1998); *Zimmerman v. State*, Del.Supr., 628 A.2d 62 (1993); *Weddington v. State*, Del.Supr., 545 A.2d 607 (1988); *Duonnolo v. State*, Del.Supr., 397 A.2d 126 (1978).

9. *Zebroski*, 715 A.2d at 79 (citing *Weddington*, 545 A.2d at 615). *See also* U.S. Const. amend. XIV, § 1; Del. Const. art. I, § 7.

defendant clearly violates this standard.[10] But in situations where the racial evidence is inextricably tied either to the charged offense or the actual victim of the offense, the trial court has broad discretion to admit the evidence upon a finding that the relevance and probative value outweigh the prejudice to the defendant.[11] Two examples will illustrate this distinction.

In *Zebroski v. State*, we held that the trial court properly admitted a racially charged statement made by a white defendant in a capital murder case involving the shooting death of a black gas station attendant.[12] During trial, a witness testified that shortly after the murder, the defendant admitted to him that he "shot the nigger."[13] The trial court admitted this statement over defendant's objections, relying primarily on the State's contention that admission of this statement was necessary to rebut the defendant's claim that the shooting was accidental.[14] This Court affirmed, finding that although the remark was "unfortunate and possibly inflammatory," it evidenced the plain feeling of contempt that the defendant held toward the victim, and that the remark was relevant and inextricably tied into the charged crime.[15]

In *Weddington v. State*, we found an abuse of discretion in the trial court's failure to declare a mistrial following a racially charged statement in a case involving a black male accused of killing a white female.[16] At trial, during its cross-examination of the defendant, the State asked the defendant if he had convinced his friends to visit the victim on a previous occasion by telling them that there were "loose white women up there."[17] The State admitted that it had no basis in fact for this question. Rather, the State attempted to justify this question by arguing that it was an attempt to retaliate for the defendant's attacks on the victim's character.[18] In response, the trial court struck the statement from the record and gave a curative instruction to the jury, but did not grant the defendant's motion for a mistrial.[19] Finding no proper purpose for the State's injection of race into the proceeding, and finding that any curative instructions to the jury did not correct the constitutional defect in the defendant's trial caused by the State's actions, this Court reversed the defendant's conviction.[20]

The defendants object to several items of evidence admitted at trial. First, the defendants point to identification photographs of themselves depicting racist tee-shirts and tattoos. Second, they object to Sainson's testimony regarding a racially derogatory comment (the "offensive comment") allegedly made by Eaton prior to the assault on the Butlers. Third, they object to a statement, made by a State's witness and subsequently stricken from the record, identifying some of the defendants' tattoos as "swastikas." Finally, Eaton objects to the trial court's rulings that a photograph of his dragon tattoo and materials from a compact disc were admissible.

### Identification Photographs

After the assault, while the defendants were still in custody, the Newark police took identification photographs of the defendants. In Eaton's photographs, several tattoos were visible as well as his tee-shirt. This tee-shirt contained the phrase "Nordic Thunder" and had two illustrations, one of a "skinhead" holding a disembodied head and the other of a lynching of a black man. Reynolds' and Floudiotis' photographs depicted several tattoos, including one of World War II-era Nazi soldiers, some of which were located under

---

10. *See Dawson v. Delaware*, 503 U.S. 159, 166–67, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992); *Weddington*, 545 A.2d at 614–15.

11. *See Zebroski*, 715 A.2d at 79; *Zimmerman*, 628 A.2d at 65–66; *Duonnolo*, 397 A.2d at 128–29.

12. 715 A.2d at 78–80.

13. *Id.*

14. *Id.*

15. *Id.*

16. 545 A.2d at 610–615.

17. *Id.* at 610.

18. *Id.*

19. *Id.*

20. *Id.* at 614–615.

their shirts when Corporal Ryser apprehended them. In Carr's photograph, Carr was wearing a tee-shirt depicting a confederate flag and the phrase "no remorse." In this photograph, Carr did not have a shaved head or any visible tattoos.

Although none of the defendants disputed being in the Deer Park on the night of the assault and none of the witnesses to the assault could give anything better than a general description of the assailants, the State offered these photographs into evidence. The defendants objected, arguing that the photographs were irrelevant and highly inflammatory due to their content. Carr and Eaton requested that the trial court at least delete the objectionable images on the photographs of their tee-shirts. The State argued that the photographs show what the defendants looked like on the night of the assault. But the witnesses to the attack in the parking lot of the Deer Park gave nothing more than a general description of the assailants as young men, similarly dressed, with short haircuts. Significantly, not one witness to the assault testified as to the tee-shirts or the tattoos worn by the defendants, so the tee-shirt depiction did not go to identification.[21]

The trial court, finding that the photographs had probative value in depicting the defendants at the time of their arrest, admitted the photographs into evidence without any alteration. In our view, however, the probative value, if any, of these photographs is minimal, except to show that the defendants met the general description provided by the Butlers, Parodi and Fecak.[22] On the other hand, the prejudicial effect of these photographs is substantial. Eaton's tee-shirt depicted a highly inflammatory scene of the lynching of a black man. Some of the visible tattoos depicted either swastikas or Nazi troops. These had no relevance to identification or to the theory of the crime and served only to inflame the passions of the jury. These images, at least implicitly, labeled the defendants as white supremacists. Whether or not the State did so calculatingly, as it did in *Weddington*, the admission of these photographs injected race and prejudice into the proceedings with no proper purpose.

■ We decide only that the photographs, as admitted, improperly injected race and prejudice into the defendants' trial. We need not decide whether, in a future re-trial, properly altered photographs might be admissible. In such a situation, the trial court would need to evaluate the evidence to see if the State sufficiently mitigated the prejudicial effect of the photographs in light of the circumstances at trial if and when the photographs are offered.

### Offensive Comments

The defendants next object to the admission of a portion of Sainson's testimony. Sainson testified about statements directed at her on the night of the assault. As she walked into the Deer Park that night, one of a group of young white men with crew cuts, short-sleeved shirts and tattoos made an offensive comment to the effect that, "I'm going to have some black meat tonight." She described the declarant as a young white man with very short dark hair and a dragon tattoo on one of his biceps. The State alleged that the declarant was Eaton, since he met this description in all respects on the night of the assault.

The State argues that this statement was relevant since it helped prove the State's theory that the defendants were part of a group that came to the Deer Park on the night of the assault to provoke a fight with any unwitting victim. The State points to the fact that the same person who made the offensive comment to Sainson, or within her hearing, also made aggressive statements toward Hamby. Immediately after these statements, Reynolds defused the situation, and a third individual (presumably Floudiotis) with an "in memory of ..." tattoo then

---

21. Some of the tattoos in the photographs do match the descriptions provided by Sainson and Hamby, but they did not witness the actual assault, only the events earlier in the night inside the Deer Park.

22. It is worthy of note that Carr did not meet even the general description. He did not have closely cropped hair, tattoos, or heavy work boots at the time of his detention on the night of the assault.

explained to Hamby that they were "looking to f___k somebody up" that night.

The State may offer testimony from Sainson and Hamby, even though neither of them actually witnessed the assault. The defendants incorrectly argue that this testimony is irrelevant. It goes to motive and conspiracy, although it alone is insufficient to sustain a conviction of the defendants.[23] That being said, the relevance of Sainson's testimony concerning the offensive comment is far outweighed by its unfair prejudicial impact.

According to the State, several factors support the probative value of the offensive comment. It argues that this statement tends to prove the existence of the conspiracy described to Hamby by the man with the "in memory of . . ." tattoo. Furthermore, provocative acts like the offensive comment directed at Sainson, who is black, tended to show the intent to assault because, according to the State, they evidence an attempt to start a fight with Hamby and Sainson. The State also argued, vaguely and without specificity, that the offensive comment could help the jury understand Sainson's state of mind.

On the other hand, the offensive comment had a significant prejudicial effect on the defendants' right to a fair trial. Like the identification photographs, the offensive comment inexorably tends to paint the defendants as racists. Such a depiction is irrelevant to the charged crime of assault on white victims, and merely serves to inflame the passions of the jury.

In its ruling permitting Sainson to testify about the offensive comment, the trial court apparently was not sensitive to the prejudicial impact of this testimony. Rather, the trial court seemed to limit itself to a basic relevancy analysis. Once it determined that the statement was relevant, it apparently stopped its analysis and ruled the statement admissible.

23. *See generally Getz v. State,* Del.Supr., 538 A.2d 726, 731 (1988).

24. We note that Hamby testified to the offensive comment as well, but he did not testify to the actual words employed by the declarant. He described it generally as an insulting comment

■ This case does differ from *Weddington* in that the racial evidence in that case had no proper purpose whereas this racial evidence arguably has some relevance to the State's theory of prosecution. But the test required by D.R.E. 403 does not render inadmissible only evidence that has no relevance. Rather, the D.R.E. 403 balancing test specifically contemplates the inadmissibility of otherwise relevant evidence that is "substantially" outweighed by prejudicial impact. Here, any probative value of the offensive comment was substantially outweighed by its prejudicial impact. The trial court abused its discretion in admitting Sainson's testimony with respect to the offensive comment.[24] This was reversible error.

### Swastika Reference

The defendants' third contention with respect to prejudicial evidence concerns testimony elicited from Corporal Poley of the Newark Police Department. Corporal Poley, as one of the first officers on the scene at the Deer Park after the assault, testified about what she observed and the statements she collected from witnesses. At one point, the following exchange took place:

*Prosecutor:* You said you saw tattoos on some of the defendants maybe?

*Corporal Poley:* Yes.

*Prosecutor:* Which ones?

*Corporal Poley:* I know Floudiotis. In this case I was looking for one particular tattoo that had been mentioned to me by one of the witnesses at Deer Park, and it was the one that said In Memory of Hammer Joe Rowan. There were numerous tattoos on other subjects, but that's the only one I'm certain about.

*Prosecutor:* Can you describe these numerous other tattoos?

*Corporal Poley:* There were swastikas.

*(Reynolds' trial counsel):* Objection. Oh, my God. Objection.

directed towards his friend. We express no opinion whether Sainson's testimony would be admissible in a retrial if it described the insult in general terms that did not raise the specter of race.

*The Court:* That last response is stricken from the record.

The court later instructed the jury to disregard the statement. The defendants argue that even though the trial court immediately struck the reference to swastikas and issued a cautionary instruction to the jury, the prejudice engendered by this statement indelibly tainted the jury and required a mistrial.

The trial court recognized the highly prejudicial nature of Corporal Poley's reference to swastikas, a symbol indelibly linked to racial hatred. By identifying this symbol with the defendants, Corporal Poley's testimony necessarily imputes to them a racist belief that has no relevance to the charged crime. But the issue is not whether admission of the statement was improper. Rather, it is whether the trial court sufficiently cured this error by striking the offending statement from the record and instructing the jury to disregard it.

In *Zimmerman v. State,*[25] this Court found itself faced with a similar situation. In that case, the State sought to introduce a tape-recorded conversation between the defendant and his alleged victim.[26] The trial court admitted the tape, except for one portion where the defendant used a racially derogatory term.[27] Later, the trial court reminded the State not to play the excluded portion and the prosecutor assured the trial court that he would not.[28] But the State did play the excluded portion, apparently inadvertently, when it presented the recorded conversation to the jury.[29] The trial court denied the defendant's motion for a mistrial, but immediately instructed the jury to disregard the excluded portion.[30] We held that the trial court did not abuse its discretion because,

"[a]s, a general rule, a curative instruction is usually sufficient to remedy any prejudice which might result from inadmissible evidence admitted through oversight."[31] We then applied the three-part test outlined in *Hughes·v. State*[32] to determine whether any error caused by the admission of the excluded portion was rendered harmless as a result of the trial court's curative instructions.[33]

As this Court noted in *Zimmerman,* a curative instruction usually suffices to make an inadvertent error harmless. Defendants argue that application of the *Hughes* test in this case, however, leads to the conclusion that this is one of the situations where it did not suffice.

The first factor of the *Hughes* test is the closeness of the case.[34] This case was very close. The jury spent a significant amount of time in deliberation on this case, even with the prejudicial evidence admitted during trial. Furthermore, the jury did not convict the defendants of the charged assault crimes, choosing instead to convict the defendants of lesser included offenses.

The second factor is the centrality of the issue affected by the alleged error.[35] In this case, the issue affected by Corporal Poley's reference to swastikas is the impartiality of the jury. This Court has noted that " '[t]he impartiality of the jury must exist at the outset of the trial and it must be preserved throughout the entire trial.' "[36] A statement linking a defendant to a powerful symbol of racial hatred, when improperly injected into a criminal trial, can substantially affect the jury's ability to regard the defendant fairly and impartially.

The third factor in the *Hughes* test is the adequacy of the steps taken by the trial court

25. Del.Supr., 628 A.2d 62 (1993).

26. *Id.* at 64.

27. *Id.*

28. *Id.*

29. *Id.*

30. *Id.*

31. *Id.* at 65 (citing *Edwards v. State,* Del.Supr., 320 A.2d 701, 703 (1974)).

32. Del.Supr., 437 A.2d 559, 571 (1981).

33. *Zimmerman,* 628 A.2d at 66.

34. *Hughes,* 437 A.2d at 571.

35. *Id.*

36. *Weddington,* 545 A.2d at 613 (quoting *Miller v. North Carolina,* 4th Cir., 583 F.2d 701, 706 (1978)).

to mitigate the effects of the alleged error.[37] In this case, the trial court immediately struck Corporal Poley's reference to swastika tattoos from the record. After a side-bar discussion and denial of the defendants' immediate motion for a mistrial, the trial court stated only the following to the jury: "I remind the jury that the response is stricken from the record and you are to disregard the response."

The trial court knew the import of Corporal Poley's reference to swastikas.[38] In such a situation, the trial court has a difficult task in mitigating the error without placing undue emphasis upon it in the minds of the jury. Considering the nature of the stricken statement in the context of this case, mitigation may not have been practicable. But the trial court could have specifically instructed the members of the jury not to allow any offense they may have taken at Corporal Poley's reference to swastikas to color their determination of the defendants' guilt or innocence.[39]

Like the situation in *Zimmerman*, no evidence was adduced that the State intentionally elicited Corporal Poley's objectionable testimony. But unlike *Zimmerman*, the State did not have a very strong case against the defendants here. The State's evidence contained some gaps and inconsistencies that the jury might have ignored if bias against the defendants had not possibly clouded its judgment. Considering the time the jury spent deliberating and the moderating nature of the verdict, any error need not have been glaring to have had an adverse impact on the defendants' trial.

The trial court here should have been especially sensitive to the impact of such prejudicial testimony in such a close case, particularly where potentially prejudicial evidence was a recurring problem. But in view of the fact that the judgment of the trial court is reversed on other grounds, we need not decide if it was reversible error not to declare a mistrial or to give a more appropriate instruction to the jury. We assume this problematic issue will be avoided in the management of any retrial.

### Dragon Tattoo and Compact Disc

The defendants' final contentions with respect to these evidentiary rulings involving prejudice concern one of Eaton's tattoos and a compact disc. Both of these rulings resulted in defense stipulations rather than the admission of the evidence. Nevertheless, these evidentiary rulings by the trial court remain ripe for review to determine if the trial court's rulings coerced or unduly influenced the stipulations.[40]

The trial court ruled that Eaton's dragon tattoo, which contained a swastika within it, was admissible as an identifying feature testified to by Sainson and Hamby. Through this tattoo, the State's witnesses could identify Eaton as the man who tried to instigate a confrontation with them. By contrast, no State's witness could identify any of the defendants by the images on their shirts depicted in the identification photographs or specific swastika tattoos noted by Corporal Poley.

The trial court further ruled that the State could present literature from a compact disc. This literature, from a band called "Nordic Thunder" thanked Eaton and his band, "Aggravated Assault." Reynolds was a member of "Nordic Thunder" as was Hammer Joe Rowan, the man memorialized in a tattoo on Floudiotis' arm. The State offered this evidence in an attempt to prove that the defendants all knew each other before the night of the assault. The defendants objected to the prejudicial impact that this material would have on the jury.

In order to prove its theory of conspiracy, the State needed to prove that the defendants came to the Deer Park that night with the intention of hurting someone. This required a showing that the defendants knew

---

37. *Hughes*, 437 A.2d at 571.

38. In previous rulings, realizing the prejudicial impact of such an identification, the trial court prevented the State from referring to the defendants as skinheads.

39. *Cf. Zimmerman*, 628 A.2d at 66 n. 4.

40. *See Delaware Electric Coop. v. Duphily*, Del. Supr., 703 A.2d 1202, 1208 (1997); *see generally Dawson v. Delaware*, 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992) (United States Supreme Court reversed based on evidence stipulated to by defendant at trial).

each other. Similarly, the identification of Eaton by the State's witnesses was central to the State's theory of motive and conspiracy.

This highlights the precarious role of the trial judge in handling much of the evidence in this case, which contains references to beliefs allegedly espoused by the defendants that are highly offensive to reasonable persons. A trial court must exclude evidence that has a high degree of unfair prejudice that outweighs its probative value. Equally important, a defendant must not always be permitted to use this evidentiary shield as a weapon to hamper the State's ability to prove its case when the relevance outweighs the prejudice.

Because we find reversible · error elsewhere, we need not decide whether these rulings constituted reversible error. In a retrial, however, the trial court will need to balance carefully the competing prejudicial and probative values of these items of evidence, if offered, in the context then presented to the court to determine whether the D.R.E. 403 balancing test renders them admissible or inadmissible, and to make a proper record to support the ruling.

### Sufficient Foundation for Photographic Evidence Offered by Defendants

Eaton and Carr challenge the Superior Court's ruling excluding nighttime photographs offered by them of the Deer Park parking lot. They contend that the defense satisfied the foundational requirements for their admission through the testimony of Corporal Poley that they were a "pretty accurate depiction."

The Superior Court ruled the photographs inadmissible unless the photographer was available for cross-examination. The State concedes that the photographer is not neces-

sary in order to lay a proper foundation for the admission of photographs, but argues nonetheless that the defendants did not lay a proper foundation and that the photographs were cumulative due to prior witness testimony about the area where the assault occurred.

■■■ We review a trial court's decision on the admissibility of evidence for abuse of discretion.[41] The photographs were relevant to the testimony of the eyewitnesses and not cumulative. None of the admitted photographs of the parking lot demonstrated the area under nighttime conditions. Officer Poley's testimony that the photographs were a "pretty accurate depiction" of the parking lot was sufficient to support a finding that they were what they were purported to be, thereby satisfying the authenticity requirement.[42] Since the probative value of the photographs outweighed any prejudicial effect,[43] we find that the Superior Court abused its discretion in denying the admission of the nighttime photographs. We need not decide, however, if the exclusion of this evidence was harmless error. At any retrial at which the photographs are offered, we assume they will be admitted into evidence.

### Testimony Concerning Witness' Current Employment

At trial, Carr's counsel asked Fecak to disclose his current place of employment. Carr argues that he asked the question concerning current employment to determine if Fecak still worked at the Deer Park. He contends that this information would have enabled him (and the jury) to explore whether Fecak had any interest in protecting the Deer Park from any possible civil liability. The State objected, claiming that it was concerned for Fecak's safety and did not want

---

**41.** *Williamson v. State*, Del.Supr., 707 A.2d 350, 354 (1998); *Longfellow v. State*, Del.Supr., 688 A.2d 1370, 1372, *cert. denied*, —— U.S. ——, 117 S.Ct. 2524, 138 L.Ed.2d 1024 (1997).

**42.** D.R.E. 901.

**43.** *See Dickens v. State*, Del.Supr., 437 A.2d 159, 162 (1981) ("[t]he test of admissibility of photographs is whether their material and probative value outweighs their prejudicial effect"); *United States v. Holmquist*, 1st Cir., 36 F.3d 154, 169

(1994), *cert. denied,* 514 U.S. 1084, 115 S.Ct. 1797, 131 L.Ed.2d 724 (1995) (finding that "[a] photograph's contents, buttressed by indirect or circumstantial evidence, can form a sufficient basis for authentication even without the testimony of the photographer," and noting that "the defense had a fair opportunity to cross-examine" regarding the witness' lack of personal knowledge of the photograph's preparation); D.R.E. 403.

any information concerning his current employment to be a part of the record. The trial court agreed with the State, but also allowed Carr to explore in other ways any possible bias. Carr chose not to ask these alternative questions of Fecak.

The issue here is whether the trial court should have permitted Carr to inquire where Fecak currently worked to impeach him for any evidence of bias. Undoubtedly, as an accused, Carr has the constitutional right to attempt to impeach any prosecution witness.[44] But this right often must be balanced against other, equally important concerns such as witness safety. In *Weber v. State*,[45] we considered this balance and held that the trial court may limit cross-examination so long as the jury has sufficient evidence to allow it to draw inferences of credibility and reliability of the witness, and the defense has enough of a record to point to any possible bias.[46]

 In balancing Carr's right to impeach Fecak with Fecak's right to be free from harm, the trial court did not abuse its discretion. It allowed Carr to reach the substantive issue of impeachment without eliciting any information as to Fecak's current employment. The danger to Fecak from this question was probably negligible. But the result of the trial court's balancing satisfied the requirements set forth in *Weber*. Carr's claim of error must fail.

### Admission of Eaton's Boots into Evidence

Eaton contends that the trial court erred in admitting evidence recovered from his combat boots. He argues that, because Detective Johnson illegally seized his boots at the police station, they are the fruit of this unlawful warrantless search, and the fibers consistent with Kimberly Butler's tank top that the police found on his boots should not have been admitted by the trial court.

 Normally, we review for abuse of discretion the trial court's decision to admit items into evidence.[47] But in this situation, the trial court had to make an initial finding that Detective Johnson possessed probable cause to arrest Eaton before it could admit the evidence as resulting from a search incident to arrest. We review *de novo* a trial court's decision regarding probable cause .[48]

Eaton argues that Detective Johnson seized his boots without sufficient probable cause to arrest him. This is a very close issue factually that we need not decide, as we find that Eaton's boots were admissible under the exigent circumstances exception to the search warrant requirement.

 The exigent circumstances exception to the search warrant requirement permits police to seize an item without a warrant if they have a good faith belief that the item contains evidence that could be destroyed by the time a warrant is available.[49] The State has the burden of proving that exigent circumstances existed in such cases.[50] In this case, Detective Johnson testified that, considering the fact that the Butlers were severely beaten and kicked, he believed that the defendants' footwear might contain hairs or fibers that would affirmatively link them to the Butlers. Considering Detective Johnson's good faith belief prior to the seizure, we find that this seizure qualified under the exigent circumstances exception to the search warrant requirement.

### Severance

The defendants contend that the trial court erred in refusing to grant them individual

---

44. *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

45. Del.Supr., 457 A.2d 674 (1983).

46. *Id.* at 682; *see also Snowden v. State*, Del. Supr., 672 A.2d 1017, 1025 (1996) (holding that a trial court has discretion to impose reasonable limits on cross-examination).

47. *Williamson*, 707 A.2d at 354.

48. *See State v. Maxwell*, Del.Supr., 624 A.2d 926, 928 (1993).

49. *See Seward v. State*, Del.Supr., 723 A.2d 365, 370–71 (1999); *Gardner v. State*, 567 A.2d 404, 410 (1989), *cert. denied* 494 U.S. 1067, 110 S.Ct. 1785, 108 L.Ed.2d 786 (1990). *C.f.* U.S. Const. amend. IV.

50. *See Seward*, 723 A.2d at 371; *Mason v. State*, Del.Supr., 534 A.2d 242, 248 (1987).

trials. The motions for severance center primarily around two statements allegedly made by Floudiotis. The first is Aozaman's testimony regarding Floudiotis' alleged confession to her following the assault. The second is the comment directed at Hamby and allegedly made by Floudiotis that the group of young, similarly dressed white men with crew cuts at the Deer Park on the night of the assault were there to "f...k somebody up." (For ease of reference we will refer to this as the "Hamby statement.")

Floudiotis asserts that without severance he could not effectively cross-examine Aozaman concerning possibly exculpatory portions of his alleged confession. The other defendants argue that both statements violated their rights under both the Confrontation Clause [51] and precedent established by this Court.[52]

At least in part, the trial court did not follow the proper procedure with respect to the severance motions. But, in view of the fact that the judgment of the trial court is reversed on other grounds, we need not decide if the denial of any of the motions for severance was reversible error. The trial court may be called upon to decide any severance issues that may arise in a retrial. Accordingly, we undertake to provide some guidance for the trial court's consideration in the event that a motion to sever is made in connection with any retrial.

■■■■■ Joint defendants address motions for severance to the sound discretion of the trial court.[53] We review such motions to determine only if, under the specific facts and circumstances of the case before us, the trial court abused its discretion in denying the motion.[54] Normally, judicial economy dictates that the State should jointly try defendants indicted for the same crime or crimes.[55] But, if the defendants can show a reasonable and not hypothetical probability that substantial prejudice may result from a joint trial, the trial court may grant separate trials.[56]

In *Manley*, adapting a test first laid out in *Jenkins*, we listed the following factors that the trial court should consider when determining whether a motion for severance should be granted: (1) problems involving a co-defendant's extra-judicial statements; (2) an absence of substantial independent competent evidence of the movant's guilt; (3) antagonistic defenses as between the co-defendant and the movant; and (4) difficulty in segregating the State's evidence as between the co-defendant and the movant.[57] Had the trial court properly considered these factors, and found any of them to exist, it may have decided that severance was appropriate for one or more of the defendants.

### Carr, Eaton and Reynolds

Carr, Eaton and Reynolds each raised severance claims based on the admission of the Hamby statement and Floudiotis' confession. Both of these statements implicate the first prong of a *Manley/Jenkins* analysis. We will address each in turn.

■■■■ The Hamby statement was a source of controversy on many fronts. First, the defendants contend that Hamby never testified that the man with the "in memory of ..." tattoo, presumably Floudiotis, said

**51.** U.S. Const. amend. VI; *see also* Del. Const., art. I, § 7.

**52.** *Manley v. State*, Del.Supr., 709 A.2d 643 (1998); *Jenkins v. State*, Del.Supr., 230 A.2d 262 (1967).

**53.** *Skinner v. State*, Del.Supr., 575 A.2d 1108, 1118 (1990).

**54.** *See id.*

**55.** Del.Super.Ct.Crim.R. 8(b) provides in relevant part: "*Joinder of Defendants*. Two or more defendants may be charged in the same indictment if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."

**56.** *See Skinner*, 575 A.2d at 1117–18. Del.Super.Ct.Crim.R. 14 provides in relevant part:

If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trial of counts, grant a severance of defendants or provide whatever other relief justice requires.

**57.** *Manley*, 709 A.2d at 652 (citing *Jenkins*, 230 A.2d at 273).

"we're going to f...k somebody up." [58] In fact, they point out that this language, attributed to Hamby, came from Corporal Poley's testimony recounting her post-assault interview with Hamby at the Deer Park. This is a distinction without a difference as the trial court properly admitted Corporal Poley's testimony under 11 *Del.C.* § 3507.[59] Hamby's statement to Corporal Poley was a voluntary out-of-court statement by a witness subject to cross-examination. Thus, it has independent probative value.

█ The trial court chose to admit the Hamby statement under D.R.E. 803(3), the exception to the hearsay rule covering statements that are probative of the declarant's then existing mental state. The trial court did not err in this ruling, but the admission of this statement against Floudiotis, the putative declarant, required substantial protection for the other defendants if a joint trial was to continue.

The fourth and final prong of the *Manley/Jenkins* analysis presents the strongest argument for severance. With a statement like "we're going to f...k somebody up" admitted into evidence against only one defendant in a joint trial, the jury would have difficulty segregating the State's evidence as between the various defendants. It would be very easy for the jury to translate the plural nature of this statement into an accusation against Carr, Eaton and Reynolds when the trial court admitted it as evidence only against Floudiotis.

Correlative to the *Manley/Jenkins* analysis and in keeping with United States Supreme Court precedent,[60] we have consistently held that the admission of a non-testifying co-defendant's statement that tends to incriminate the defendant violates the Confrontation Clause.[61] In this case, we see no cautionary instructions to the jury or attempts at redaction by the trial court to ensure that the Hamby statement implicated only Floudiotis. The lack of cautionary statements, however, is probably irrelevant. We have noted in the past that even repeated cautionary instructions to the jury "neither eradicate inadmissible evidence from the minds of the jury nor obviate the possibility of the jury being misled by the statement of a co-conspirator." [62]

The State now argues that, while still admissible under D.R.E. 803(3), the statement was also admissible under D.R.E. 801(d)(2)(E). This rule provides that statements by a co-conspirator are not hearsay and are admissible against other co-conspirators. If the trial court had found the Hamby statement admissible under D.R.E. 801(d)(2)(E), it would have been admissible against each of the defendants, and the trial court would not have needed to afford any special protection to Carr, Eaton or Reynolds. But the trial court did not make this finding, and this is a choice that we cannot make *sua sponte*. It will be up to the trial court to make this choice in light of this Opinion, the events of the first trial and the circumstances then presented to the court in the event of a retrial.

D.R.E. 801(d)(2)(E) allows the trial court to admit the statement of a co-conspirator in

---

58. On direct examination, Hamby testified that he could not remember the exact context or extent of the statement, but that the person had said something about "f...ing somebody up." During cross-examination, Hamby testified that he "couldn't tell you whether the person said basically they were looking to f...k somebody up ... or that if anybody gives us any s...t, we're going to f...k people up. We're being obnoxious, like if anybody's going to take offense, hey."

59. 11 *Del.C.* § 3507 provides that:

(a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

(b) The rule in subsection (a) of this section shall apply regardless of whether or not the witness' in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party.

60. *See, e.g., Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998); *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

61. *See, e.g., Smith v. State*, Del.Supr., 647 A.2d 1083, 1089 (1994); *Blodgett v. State*, Del.Supr., 310 A.2d 628, 629 (1973).

62. *Jenkins*, 230 A.2d at 273.

the course and in furtherance of the conspiracy only if "the conspiracy has first been established by the preponderance of the evidence *to the satisfaction of the court*."[63] The State cannot bootstrap by arguing that a conspiracy obviously existed due to the evidence adduced at trial. The evidence must exist to the satisfaction of the trial court at the time the statement is offered.[64] In any re-trial, the trial court will need to decide whether to admit the Hamby statement as the statement of a co-conspirator made in the course and in furtherance of the conspiracy. If the trial court decides to do so, the Confrontation Clause issues raised by Carr, Eaton and Reynolds may not be applicable.[65]

Floudiotis' confession raises less concern than the Hamby statement under the *Manley/Jenkins* analysis. This is primarily because the trial court redacted the confession to eliminate any reference to defendants other than Floudiotis. As noted above, Delaware follows the general rule concerning incriminating statements by a non-testifying co-defendant that the United States Supreme Court laid out in *Bruton v. United States*.[66] But in *Richardson v. Marsh*,[67] and again in *Gray v. Maryland*,[68] the United States Supreme Court held that, by properly redacting these statements to eliminate any reference or inference to the defendant, the trial court can eliminate the concerns raised in *Bruton*.

 In this case, the confession in its unredacted form specifically implicated Carr as the instigator of the assault. According to Aozaman, Floudiotis told her that Carr threw the beer on Kimberly Butler in an attempt to show off. The trial court realized the *Bruton* problems implicit in this testimony and directed that Aozaman's testimony not refer to Carr by name. If the subject came up, Aozaman was directed to refer to Carr as "someone." The trial court also ruled that the Eaton and Reynolds could not ask Aozaman on cross examination whether their client had instigated the fight, as this would lead to the implication that Carr had done so. We find that the trial court handled this issue thoughtfully and correctly under *Richardson* and *Gray*.

The first and fourth prongs of the *Manley/Jenkins* analysis operate in favor of this conclusion. With the trial court's redaction, the defendants other than Floudiotis could not claim that the confession was an incriminating statement of a non-testifying co-defendant. For the same reason, they also could not claim that the confession would be difficult for the jury to segregate from the State's evidence against them.

Eaton and Reynolds also object to the fact that the trial court did not permit them to cross-examine Aozaman to determine whether either of them was the "someone" who instigated the fight. At first blush, this seems like the type of conflict between the rights of co-defendants that should automatically militate in favor of severance. For Eaton and Reynolds to have their way would be for Carr to be implicated. For Carr to have his way, Eaton and Reynolds seemingly cannot assert their best defenses. But this argument is illusory.

 In *United States v. Edwards*, the United States Court of Appeals for the Eighth Circuit Court recently decided a case involving this issue.[69] We find its analysis

---

**63.** D.R.E. 801(d)(2)(E) (emphasis supplied).

**64.** *C.f. Lloyd v. State*, Del.Supr., 534 A.2d 1262, 1264 (1987). In *Lloyd*, the trial court actually admitted the statement under 801(d)(2)(E), but with an incomplete analysis to determine if a conspiracy existed. We found that the trial court did not err, even if it did not specifically articulate all elements necessary to find a conspiracy. In the instant case, the trial court never admitted the statement under 801(d)(2)(E) in the first place.

**65.** *See Bourjaily v. United States*, 483 U.S. 171, 182–84, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *Williamson v. State*, Del.Supr., 707 A.2d 350, 356

(1998) (holding that if a co-defendants' statement is otherwise admissible against the defendant, the court need not conduct a separate Confrontation Clause inquiry.).

**66.** 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

**67.** 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).

**68.** 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998).

**69.** 8th Cir, 159 F.3d 1117 (1998).

persuasive. In *Edwards*, a defendant objected to the redaction of one co-defendant's statement that directly implicated two other co-defendants in the charged crime.[70] The defendant argued that by changing the names of the co-defendants to "group of people," and preventing his cross-examination from establishing that he was not one of the "group of people" mentioned, the trial court violated his right to a fair trial.[71] The Eighth Circuit dismissed the defendant's claim of error, finding that:

> the only reference to him (by omission) was exculpatory, and exculpatory out-of-court declarations are not admissible hearsay, even if they include a statement against the declarant's penal interest.[72]

In this case, the same analysis applies, and the trial court correctly determined that Eaton and Reynolds could not elicit testimony that they were not mentioned in the confession. Since this testimony would have been inadmissible, the trial court's refusal to allow it does not impact on any of the defendants' severance claims.

The second and third prongs of the *Manley/Jenkins* analysis are not directly implicated by either the Hamby statement or the confession. The second prong directs the trial court to determine whether substantial independent evidence of the movant's guilt exists when deciding whether severance is appropriate.[73] The third prong directs the trial court to consider antagonistic defenses as between the movant and the co-defendants.[74]

With respect to Carr, there was no independent evidence of his participation in the assault except for his presence in Reynolds' truck when Corporal Ryser stopped it outside the Deer Park, and the confession, redacted for the purpose of trial to eliminate any reference to him. He did not even meet the general description provided by any of the eyewitnesses, as he had longer hair and

no tattoos and was not wearing combat boots. Some amount of independent evidence did exist, however, with respect to Eaton (identification of dragon tattoo by witnesses and fibers from Kimberly Butler's tank top on his shoes) and Reynolds (Hamby identified him specifically and Fecak noted the license plate number of his truck leaving the Deer Park). The trial court will need to consider these factors in any future retrial.

Unlike the case in *Jenkins*, where to believe one co-defendant's version of events was to disbelieve the other's, this case does not present antagonistic defenses between the parties.[75] All of the defendants in this case professed their innocence and claimed to have taken no part in the assault on the Butlers. This is not a mutually antagonistic defensive posture.

### Floudiotis

Of all the defendants, Floudiotis appears to have the weakest case for severance. Floudiotis asserts no problems with the extrajudicial statements of a co-defendant since the only statements that the State attributed at trial to any of the defendants were attributed to Floudiotis. Floudiotis argues instead that the trial court should have severed his case from those of the other defendants because, without a separate trial, he could not effectively cross-examine his ex-girlfriend, Aozaman. He asserts that the trial court denied him a fair trial by proscribing Aozaman from testifying about the involvement of the other defendants, specifically Carr.

Although he does not mention it explicitly, Floudiotis seems to be relying on the evidentiary rule of completeness. This rule, in its common law form, states that one "against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the

---

**70.** *Id.* at 1127.

**71.** *Id.*

**72.** *Id.* (citing *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994)).

**73.** *Manley*, 709 A.2d at 652 (citing *Jenkins*, 230 A.2d at 273).

**74.** *Id.*

**75.** *Jenkins*, 230 A.2d at 273.

utterance."[76] This rule serves the dual purpose of presenting the jury with an accurate representation of the defendant's statement while also protecting the defendant against prejudice resulting from an incomplete portrayal of the statement.[77]

The rule of completeness is codified in D.R.E. 106.[78] We have previously applied D.R.E. 106 to situations involving witness testimony concerning statements made by defendants.[79] Occasionally, however, a situation arises where literal compliance with the requirements of *Bruton* seems to restrict the rule of completeness in a joint trial. As the United States Court of Appeals for the Fifth Circuit recently noted, the trial court must determine whether the redacted statements create "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."[80] If so, the trial court should grant the prejudiced defendant's motion for severance.

 In this case, the trial court permitted Floudiotis' counsel to inquire of Aozaman whether Floudiotis told her that someone else instigated the assault. For the purposes of Floudiotis' right to a fair trial, eliciting this information from Aozaman left Floudiotis in no worse position regarding his culpability than if the trial court had permitted Aozaman to identify Carr specifically as the instigator. Considering the lack of any real prejudice suffered by him as a result of the trial court's redaction of Aozaman's testimony, Floudiotis has failed to convince us that the redacted statements compromised one of his specific trial rights.

This is a particularly delicate case for the application by the trial judge of proper procedures in deciding on joint or several trials. The trial judge, on any retrial of this case, will have the benefit of the evidence as it developed in the first trial and the guidance of this Opinion.

We do not expressly direct that there be a joint trial or a separate trial. The former is fraught with the management of difficult issues exemplified by Floudiotis' confession and the Hamby statement. The latter challenges realistic principles of judicial economy. The judiciary should not be burdened with an unrealistic and expensive succession of separate trials with duplicate evidence if skillful management of a joint trial will protect defendants. There are no "short cuts" in the analysis the trial judge must bring to bear in applying the standards discussed in this Opinion. The determination of these issues will be left to the trial judge's discretion. In exercising its discretion, the trial court should set forth a statement of record supporting that exercise of discretion to enable this Court to conduct a meaningful review, if necessary.

### Conclusion

We find that the trial court abused its discretion in several respects in this very complex and highly charged joint trial. Due to the closeness of the case and the moderating nature of the jury verdict, we cannot say that these errors were harmless beyond a reasonable doubt. Accordingly, the judgment of the Superior Court as to each defendant is reversed.

---

**76.** J. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2113, p. 653 (J. Chadbourn rev.1978) (quoted in *Beech Aircraft v. Rainey*, 488 U.S. 153, 171, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988)).

**77.** *See Beech Aircraft*, 488 U.S. at 172 n. 14, 109 S.Ct. 439.

**78.** D.R.E. 106 provides that:
when a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded state-

ment which ought in fairness to be considered contemporaneously with it.

**79.** *See Williamson v. State*, Del.Supr., 707 A.2d 350, 360–61 (1998); *Burke v. State*, Del.Supr., 484 A.2d 490, 496–97 (1984).

**80.** *United States v. Burns*, 5th Cir., 162 F.3d 840, 853 (1998) (quoting *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993)).