IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TAHA EL-ABBADI, | § | |
| | § | |
| | § | |
| Defendant Below, | § | No. 364, 2022 |
| Appellant, | § | |
| | § | |
| v. | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| STATE OF DELAWARE, | § | |
| | § | I.D. No. 1908013052(N) |
| | § | |
| Appellee. | § | |
| | § | |

Submitted: October 25, 2023
Decided: January 2, 2024

Before **VALIHURA**, **LEGROW**, and **GRIFFITHS**, Justices.

On appeal from the Superior Court. **AFFIRMED**.

Nicole M. Walker, Esquire (*argued*), Santino Ceccotti, Esquire, Office of the Public Defender, Wilmington, Delaware.

Kathryn J. Garrison, Esquire, Department of Justice, Wilmington, Delaware.

**VALIHURA, J.**

## I.     INTRODUCTION

Defendant Below, Appellant Taha El-Abbadi ("El-Abbadi"), seeks to overturn his conviction after a jury found him guilty of Murder by Abuse or Neglect in the First Degree ("MBAN, First Degree") for the death of three-year-old Julian Cepeda ("Julian").  The Superior Court denied his request for lesser-included offense ("LIO") jury instructions and sustained objections by the State to his cross-examination and testimony regarding a prior involvement of the victim's mother with the Division of Family Services ("DFS").  El-Abbadi challenges both rulings on appeal.  For the following reasons, we AFFIRM the Superior Court's rulings.

## II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.  The Weekend and Morning Prior to Julian's Injury

On August 19, 2019, El-Abbadi had been dating Meagan Alvarez ("Alvarez"), Julian's mother, for approximately five months.  He had been living with Alvarez and her two young children, Julian and J.C.,[2] for several months in the Castle Brook Apartments in New Castle.  Alvarez had been working on potty-training Julian and had encountered difficulty in potty-training him during the weekend of August 17 and 18 of 2019.[3]  She testified that she "spanked [Julian's] butt with his diaper on[,]" because Julian had an

---

[1] The facts, except as otherwise noted, are taken from the transcript of trial testimony.  *See* App. to Opening Br. at A12–772 (Trial Transcript [hereinafter "Trial Tr. at [_]"]).

[2] J.C. is a minor and thus we refer to her by her initials.

[3] *Id.* at A425–26, A430 (Meagan Alvarez Testimony [hereinafter "Alvarez Test. at [_]"] at 73:21–74:18, 78:6–21); *Id.* at A517–18 (Taha El-Abbadi Testimony [hereinafter "El-Abbadi Test. at [_]" at 28:18–29:8).

2

accident.[4]  El-Abbadi testified that around 7:00 a.m. on August 19, 2019, he woke to screaming and yelling because Julian had wet the bed.  Instead of taking Julian and J.C. to daycare that day, Alvarez brought J.C. with her to work at Great Clips, and left Julian with El-Abbadi.  When she left, Julian was acting normally and had no visible marks or bruises.[5]  Surveillance footage shows Alvarez leaving with J.C. at 7:35 a.m.  She did not come back until later in the day and did not reenter her apartment until 5:24 p.m.

At around 8:34 a.m., Cristian Cabrerra ("Cabrerra"), a friend of El-Abbadi, visited the apartment.[6]  The two men smoked marijuana outside and ate food that they had ordered.[7]  Meanwhile, Julian played inside on an iPad.  El-Abbadi sent a picture of Julian to Alvarez around 10:23 a.m.[8]  Alvarez asked if Julian had been crying.  El-Abbadi testified that he sent the picture because he was concerned about a mark on Julian's left cheek.  Alvarez did not see any mark on Julian's cheek.[9]  At 10:54 a.m., El-Abbadi and Julian appear on surveillance footage exiting the apartment to head to the Casanova Auto Repair

---

[4] *Id*. at A430 (Alvarez Test. at 78:13–15, 78:19–20).

[5] *Id.* at A430–31 (Alvarez Test. at 78:22–79:1).

[6] *Id.* at A262 (Detective Christopher Phillips Testimony [hereinafter "Phillips Test. at [_]"] at 106:2–5).

[7] *Id.* at A342 (Cristian Cabrerra Testimony at 26:9–19); *Id* at A577, A581–82 (El-Abbadi Test. 88:17–20, 92:19–93:12).

[8] *Id.* at A405 (Detective Austin Jenkins Testimony at 53:3–12).

[9] The State introduced the picture as Exhibit 59, and it was shown to the jury.  App. to Answering Br. at B29 (State's Ex. 59).  *See also* App. to Opening Br. at A437–39 (Alvarez Test. at 87:17–22).

shop, where El-Abbadi was employed.[10] They returned at 11:34 am.[11] Surveillance footage showed Julian walking outside the apartment complex at 11:46 a.m.

### B. Julian's Changed Behavior

Around 12:00 p.m., El-Abbadi called his friend Lisa Velez. Although El-Abbadi testified that they discussed automobile parts, Ms. Velez testified that El-Abbadi told her that Julian fell while playing at a friend's house and would not wake up.[12] Alvarez testified that on a Facetime call with El-Abbadi around 1:30 p.m., Julian was awake but neither spoke nor responded to her questions. Both El-Abbadi and Julian were lying on the floor during the call. El-Abbadi testified that he told Alvarez to come get Julian due to marks on his face and buttocks.

Between 2:41 and 5:24 p.m., Alvarez ran errands between leaving work and coming home.[13] According to El-Abbadi, he went to work at the autobody shop at about 3:00 p.m. Surveillance video from the apartment complex showed El-Abbadi carrying a limp Julian to the car around 3:00 p.m. Julian remained in the car with the air conditioning on while El-Abbadi worked. Cabrerra testified that he saw Julian in the car at the autobody shop around 5:00 or 6:00 p.m., and that Julian appeared to be asleep and had purple marks on

---

[10] App. to Answering Br. at B7–10 (State's Ex. 43–44). El-Abbadi testified that he dropped off a dealer tag that morning. App. to Opening Br. at A523 (El-Abbadi Test. at 34:3–18). El-Abbadi worked for the autobody shop, and also used the facility to conduct his own business of buying and selling cars. *Id.* at A512–13 (El-Abbadi Test. at 23:13–24:9).

[11] App. to Opening Br. at A262, A264 (Phillips Test. at 106:14–16, 108:2–10).

[12] *Id.* at A326–29 (Lisa Velez Testimony at 10:16–13:1).

[13] Alvarez stopped by the rental office for a copy of her lease, registered J.C. for school, and stopped to see her sister-in-law to pick up some clothes for Julian. *Id.* at A445–46 (Alvarez Test. 93:16–94:23). *See generally id.* at A370–80 (Andrea Alvarez Testimony).

his face. When Alvarez arrived home, she called El-Abbadi because he and Julian were not there. According to Alvarez, El-Abbadi told her that Julian had an accident at the shop and that he would tell her about it when he got home.

El-Abbadi testified that he told Alvarez that Julian fell asleep in the car and would not wake up. El-Abbadi returned with Julian at 6:15 p.m. and put him in Julian's bed. A neighbor, Kaitlyn Seese, testified that she saw El-Abbadi carrying a limp and sick-looking Julian into the building.[14] Despite Alvarez's attempts to wake her son, Julian would not wake up. Alvarez testified that El-Abbadi told her that Julian had hit his head on a car lift. She testified that she thought Julian was sleeping because El-Abbadi had told her that he had given Julian some medicine after he hit his head. El-Abbadi testified that he urged Alvarez to call 911 rather than make the call himself because he had warrants for his arrest for pending cases. He also testified that Alvarez had created the car lift story to hide the fact that she was the person who hit and injured Julian. At around 7:51 p.m., after consulting her friend, Krista Hsu, Alvarez contacted an on-call doctor who connected her to 911. Alvarez testified that El-Abbadi begged her not to tell anyone his name because of his outstanding warrants. El-Abbadi left the apartment again around 7:44 p.m.

*C. Julian's Medical Treatment and Death*

Paramedics arrived at the apartment around 8:00-8:05 p.m. Keely Warrick, the paramedic responding that evening, testified to observing Julian's pale, unresponsive

---

[14] *Id.* at A272–73 (Kaitlyn Seese Testimony at 116:11–13, 117:7–8). *See also* App. to Answering Br. at B25–28 (State's Ex. 52–53).

appearance, slow breathing, and low heart rate.[15] Julian's eyes were open but unresponsive. Given the gravity of Julian's injury, Corporal Samantha Parsons, a State Trooper paramedic, flew with Julian to Alfred I. duPont Hospital for Children ("A.I. duPont") in a helicopter.[16] She testified that Julian's pupils were large and unreactive, which was indicative of brain swelling. He was exhibiting symptoms of brain injury and intracranial pressure.

When Julian arrived at the hospital, he was categorized as an "alert," indicating to the hospital staff that surgeons and extra resources would be needed.[17] The Emergency Room personnel quickly raised him from an "alert" to a "code," indicating the existence of a "life or limb threatening," situation. When describing how Julian appeared in the trauma bay, Dr. Erin Teeple, the emergency room pediatric trauma surgeon on duty that night, testified that Julian was very severely brain injured. His "pupils were fixed and dilated," he had high blood pressure, and a low heart rate. He had only the most minimal spinal reflexes remaining and his brain was swelling and herniating out of the bottom of his skull. Dr. Teeple asked Alvarez to call El-Abbadi to obtain more information about how Julian had been injured. Dr. Teeple testified that El-Abbadi told her that he and Julian "were at

---

[15] App. to Opening Br. at A62 (Keely Warrick Testimony [hereinafter "Warrick Test. at [_]"] at 53:5–9). The paramedics were dispatched at 7:55 p.m. and arrived at 8:05 p.m. Julian's heart rate was at 56 to 62 when it should have been between 90 and 150, his oxygen level was only eighty-one percent, and his respirations were sixteen respirations per minute when they should have been twenty or thirty respirations per minute. *Id* at A63–64 (Warrick Test. at 54:17–55:15).

[16] *Id.* at A164–65, A171–72 (Corporal Samantha Parsons Testimony [hereinafter "Parsons Test. at [_]"] at 8:9–9:13, 15:23–16:7). The hospital changed its name in 2021 to Nemours Children's Hospital.

[17] *Id.* at A95 (Dr. Erin Teeple Testimony [hereinafter "Teeple Test. at [_]"] at 86:19–87:4).

the auto body shop, maybe he turned to help a customer, was in some way distracted, hit his head on something metal[.]"[18]  El-Abbadi's story did not make sense to Dr. Teeple because it did not explain the severity of Julian's injuries.

In the trauma room, while doctors were examining Julian, Bernadette Clagg, a Forensic Registered Nurse in A.I. duPont's pediatric ICU unit, photographed the bruises and marks on the left side of Julian's face, on his forehead, on his cheeks, and on both buttocks.[19]  Julian was intubated with a breathing tube to aid his breathing, and required a C-collar to maintain the position of his spine and protect his spinal cord.

Pediatric neurosurgeon, Dr. Jeffery Campbell, was on call the evening of August 19, 2019 at A.I. duPont and attended to Julian when he was brought into the trauma bay by helicopter.  Dr. Campbell testified as to his assessment and treatment of Julian.  He stated that Julian had only a tiny bit of brain stem function and that had he survived, he likely would have been in a vegetative state.

Dr. Campbell testified about Julian's Glasgow Coma Score.  The Glasgow Coma Score provides a means to assess head injuries in terms of severity.  It calculates a score based upon whether a patient's eyes open, if the patient can follow commands, if the patient is verbal, has motor skills, and can respond to pain.[20]  A three is the lowest a patient can score on the Glasgow Coma chart (meaning that a patient has no neurologic function), and

---

[18] *Id.* at A103 (Teeple Test. at 94:19–22).

[19] *Id.* at A82–85 (Forensic Nurse Bernadette Clagg Testimony at 73:13–76:1).  *See also* App. to Answering Br. at B1–6 (State's Ex. 10, 11, and 13).

[20] App. to Opening Br. at A117 (Dr. Jeffrey Campbell Testimony [hereinafter "Campbell Test. at [_]"] at 108:3–18).

a fifteen is the highest. Julian scored a four out of fifteen[21] and exhibited signs of "a devastating irrecoverable brain injury."[22] The CAT scan showed a very large pan-hemispheric midline shift, where the brain swelling pushed the middle of his brain over significantly. Dr. Campbell also testified that it was one of the worst CAT scans and brain injuries he had seen in twenty-two years of practice. He testified that a larger hemorrhage is generally associated "with a higher, a worse trauma, more force applied to that."[23] Dr. Campbell operated on Julian and removed a piece of his skull bone in an attempt to drain the bleeding and relieve pressure. Prior to operating, Dr. Campbell shaved Julian's head and noted additional bruising around the top of his head.

Julian survived the surgery but most of his brain was dead. Eventually, he met the criteria for brain death after he had regressed to having no brain function at all. Dr. Campbell testified that had Julian received prompt medical treatment after the initial injuries had been inflicted, he could have survived. By the time Julian arrived at the hospital, his brain had been too damaged by the secondary injury caused by his brain swelling and bleeding.

Julian was pronounced brain dead at 6:35 p.m. on August 21, 2019, and then deceased. The State medical examiner, Dr. John Krolikowski, determined that Julian's cause of death was blunt force injury, and the manner of death was homicide.

---

[21] *Id.* at A119–20 (Campbell Test. at 110:23–111:1).

[22] *Id.* at A120 (Campbell Test. at 111:5–6).

[23] *Id.* at A130 (Campbell Test. at 121:21–23).

8

*D. El-Abbadi's Interrogation by the Police*

El-Abbadi went to the police station on his own volition around 3:00 a.m. on August 20, 2019. During the investigation, El-Abbadi told the police at least four different stories to explain how Julian had been injured. The chief investigating officer, Homicide Detective Jennifer Escheman ("Detective Escheman") began interviewing El-Abbadi in the early morning hours of August 20, 2019.[24] The first story El-Abbadi told Detective Escheman was that Julian hit his head on a chassis machine at the autobody shop. El-Abbadi said that he and Alvarez had spanked Julian early that morning because Julian had wet the bed.[25] Later that day, around 4:30 or 5:00 p.m., El-Abbadi took Julian with him to the autobody shop to get money from a customer. El-Abbadi and the customer had a disagreement, during which the customer threatened El-Abbadi. The two men had a physical altercation. El-Abbadi saw Julian run into the chassis machine and fall to the ground, hitting his head on both the chassis and the ground. Although Julian did not stand up immediately, he did cry, and was able to walk and talk. El-Abbadi took Julian to Wawa, where he purchased and gave Julian 250 mg of ibuprofen pills. El-Abbadi and Julian returned to the shop, where Julian remained in the car as El-Abbadi locked up. When El-

---

[24] App. to Answering Br. at B43 (Detective Jennifer Escheman Video Deposition [hereinafter "Escheman Test. at [_]" at 18:19–23). Due to medical reasons, Detective Escheman testified by a videotaped deposition. At the time of her deposition, Detective Escheman had been promoted to Sergeant.

[25] State's Ex. 2 at 03:15:56–16:07 (Interview of El-Abbadi by Detective Escheman). State's Ex. 2 (the first part of El-Abbadi's interview) was played for the jury. App. to Opening Br. at A337 (Trial Tr. at 21:7–15).

Abbadi returned to the car, Julian was sleeping. El-Abbadi said he did not know how serious Julian's injury was.

El-Abbadi's initial interview lasted over an hour and a half. He then agreed to go to the autobody shop with police to re-enact what happened. After he repeated this story during a reenactment of the incident at the autobody shop,[26] Detective Escheman interviewed him again on August 20 beginning at about 1:17 p.m. First, El-Abbadi recounted the initial version of the autobody shop story.[27] The only variation was that he stated that a friend went to Wawa and purchased the juice and ibuprofen instead of him.

At that point, Detective Escheman suggested that El-Abbadi's story was inconsistent with other evidence the police collected that day. El-Abbadi then pivoted to a completely different story. He stated, "I dropped [Julian] off to somebody for a little bit 'cause [sic] I had to go do my run-arounds."[28] He claimed that he dropped Julian off in Claymont with a woman named Brittany, and that Julian was injured when he picked him up. He did not know Brittany's last name. He dropped Julian off because a man was threatening him and accusing him of stealing the man's gun.

El-Abbadi gave another variation in which the man, "Hefea," called him and threatened him. When they left the house, the man saw him and followed him. The men

---

[26] State's Ex. 3. State's Ex. 3 (the autobody reenactment) was played for the jury. App. to Opening Br. at A338 (Trial Tr. at 22:13–16). *See also* App. to Answering Br. at B52–55 (Escheman Test. at 27:19–30:21); App. to Opening Br. at A644 (El-Abbadi Test. at 155:10–15).

[27] State's Ex. 4 (the second part of El-Abbadi's interview) was played for the jury. App. to Opening Br. at A338 (Trial Tr. at 22:17–19).

[28] State's Ex. 4 at 13:29:29–35.

had a physical altercation in which the man swung and hit Julian. Detective Escheman stated that the injury was not from being punched. El-Abbadi then stated that this man hit Julian with his car. El-Abbadi admitted at least twice during this segment that Julian's "bruises on his butt is [sic] from me but everything else is not."[29]

Detective Escheman commented that the previous stories about dropping Julian off with "Brittany" and Julian getting hit by a car could not be true. El-Abbadi pivoted again. He admitted that he got mad and spanked Julian that morning and again stated that the "bruises on his butt is [sic] from me."[30] Then, El-Abbadi and Julian were playing with pillows. El-Abbadi said that he hit Julian "kinda hard" with a pillow, and that Julian lay on the bed, not moving. He tried to wake Julian up by putting him in the shower but that did not work. Detective Escheman told El-Abbadi that this was not a pillow injury. Then, El-Abbadi stated that when he hit Julian with the pillow Julian went flying across the floor. He took Julian to the shop when Alvarez was coming home because Julian would not wake up. When pressed for details, El-Abbadi told a different version stating that he hit Julian three times with the pillow. The first time, Julian slid off the bed in El-Abbadi's room but was laughing. The pillow fight continued into Julian's room, where El-Abbadi hit Julian too hard, and Julian hit his head on the carpeted floor. El-Abbadi said, "it's my fault" several times. He said he put ice and lotion on Julian's buttocks after he spanked him.

---

[29] *Id*. at 13:40:48–55.

[30] *Id*. at 13:44:25–28, 13:45:35–40.

11

Detective Escheman again said that Julian was not injured by a pillow, and that this was not just a pillow fight. El-Abbadi admitted that he had been lying to Detective Escheman earlier in the interview. After Detective Escheman said that there were injuries on Julian's face. El-Abbadi then said that he "smacked" Julian's face with his hand because Julian was not listening during potty-training. Julian fell to the floor and started crying. He put cream on Julian's face. Then, the pillow fight occurred. El-Abbadi stated that when he hit Julian too hard with the pillow, Julian said "I'm ok" but then closed his eyes halfway and would not wake up. El-Abbadi then said he "freaked out" and left around 3:00 p.m. and carried Julian out.

Using a doll, Detective Escheman had El-Abbadi reenact how forcefully he hit Julian. El-Abbadi said he smacked Julian twice in the face with the pillow. The first smack was not hard because Julian was standing. But Julian hit the television and the television moved. The second smack was hard and Julian hit the floor. Julian lay in the floor and closed his eyes. El-Abbadi said at the end of the interview, "it's my fault. I deserve whatever punishment you give me."[31] He asked what his charges would be. Following this second interview, Detective Escheman placed El-Abbadi under arrest.

### E. The Proceedings in Superior Court

#### 1. Indictment

The Grand Jury indicted El-Abbadi for MBAN, First Degree. Originally, he was charged with assault rather than murder, however, the charges were amended to reflect

---

[31] *Id*. at 14:26:25–30.

12

Julian's death.

## 2. *Trial*

The jury trial began on February 11, 2022 and more than two dozen witnesses testified over five days. El-Abbadi also testified in his own defense. In addition to the testimony referenced in the chronology above, other testimony relevant to the two issues on appeal is summarized below.

### a. *Testimony Pertaining to El-Abbadi's Argument that Lesser Included Offense Jury Instructions Were Warranted*

#### 1. *The Medical Testimony*

Dr. Campbell and Dr. Stephanie Ann Deutsch testified about their assessment of Julian's injuries. Dr. Campbell testified that in his training and experience, the type of subdural hematoma Julian suffered occurs because of high velocity force,[32] such as an adult man hitting a child "with something hard."[33] Subdural hematomas may result when children are involved in high speed automobile accidents and are not wearing seat belts, or when children fall several stories out of a building. Multiple areas of bruising indicated that Julian was struck multiple times. Julian's injuries were inconsistent with a three-year-old child running into a structure, falling on a carpeted floor, or being in a pillow fight. Julian's body weight (thirty-three pounds) would not have been able to generate enough force in these circumstances to have caused his injuries.

---

[32] App. to Opening Br. at A131 (Campbell Test. at 122:10–21).

[33] *Id.* at A132 (Campbell Test. at 123:2–3). Dr. Campbell observed that "in professional boxing every once in a while someone will get a subdural, it's that kind of force that you are talking about." *Id*. (Campbell Test. at 123:3–5).

Due to the severity of his head injuries, it was likely that Julian would have become immediately unconscious and unresponsive. He would not have been able to walk, talk, or eat. When shown the 11:41 a.m. surveillance footage of Julian and El-Abbadi walking outside the apartment, Dr. Campbell testified that someone with such a subdural hematoma would not be able to walk independently. Dr. Campbell opined that a child who had sustained such an injury would need to be carried in a way consistent with the 6:15 p.m. apartment surveillance footage. Dr. Campbell testified that Julian's initial traumatic injury would worsen over time as the brain swelling further damaged his brain. Julian's presentation at the hospital, at around 8:00 p.m., was consistent with the injury having occurred between 12:00 and 3:00 p.m. According to Dr. Campbell, had Julian received medical intervention soon after his injury, he may have survived.

Dr. Deutsch testified about her observations of Julian the morning of August 20, 2019.[34] Her team investigated whether Julian had experienced "child physical abuse" given the trauma to his face and buttocks. Julian had presented as a trauma code due to concerns raised by his CT scan which showed a very large intracranial hemorrhage accompanied by herniation of the brain tissue. These observations were inconsistent with a simple accidental trauma such as a fall or head strike. She opined that the pattern of bruising on his buttocks indicated that force was "highly specific for inflicted trauma."[35]

---

[34] *Id.* at A180, A181, A185 (Dr. Stephanie Ann Deutsch [hereinafter "Deutsch Test. at [_]"] 24:6–12, 25:21–26:12, 29:3–30:1). *See generally id* at A189–194 (Deutsch Test. at 32:8–38:3).

[35] *Id.* at A190 (Deutsch Test. at 34:13–14).

She further testified that there were extensive hemorrhages to Julian's retinas in both eyes, and most notably a "thesis cavity formation," which indicated the severity of force applied to his head. This sort of injury occurs when there is "really extraordinary acceleration-deceleration, plus-minus some blunt impact component,"[36] such as a high-speed vehicle crash, a fatal crush injury, or a fall from a significant height. Julian's injury, according to Dr. Deutsch, was inconsistent with accidental trauma, such as hitting one's head at an autobody shop. Dr. Deutsch ultimately diagnosed Julian with abusive head trauma and opined that someone had physically abused Julian.

### 2. *El-Abbadi's Trial Testimony*

Contrary to what El-Abbadi told Detective Escheman during his interrogation, El-Abbadi testified at trial to another variation of what occurred on August 19, 2019. When El-Abbadi woke to screaming and yelling at around 7:00 a.m., Julian's face was red and he did not have a diaper on because he had wet the bed. El-Abbadi testified that he told Alvarez "whatever you did, just stop doing it, it takes time and patience for the child"[37] and he put Julian on the toilet. He testified that he told Alvarez to take the children to day care, but she left Julian with him, and told him she would be back by 3:00 p.m. El-Abbadi also testified that he went to drop a dealer tag off from about 11:00 to 11:20 a.m.

El-Abbadi testified that when Alvarez and El-Abbadi communicated by FaceTime, he asked her to pick up Julian because Julian had marks on his face and buttocks. He took

---

[36] *Id.* at A194 (Deutsch Test. at 38:7–9).

[37] *Id.* at A519 (El-Abbadi Test. 30:12–14).

15

Julian with him to the shop because Alvarez had not yet returned home. That afternoon, Julian was tired, and El-Abbadi carried him because Julian did not want to walk. Julian stayed in the car watching videos while El-Abbadi worked at the shop from about 3:30 to about 5:30 or 5:40 p.m. El-Abbadi testified that Julian fell asleep on the way home from the shop, and El-Abbadi carried him inside because he would not wake up. El-Abbadi denied knowing that Julian was severely injured.

Upon arriving home, El-Abbadi put Julian to bed. He testified that he told Alvarez that "I don't know what you did that morning or weekend, you know, but you got to fix your situations,"[38] and that Alvarez created the autobody shop story. El-Abbadi testified that when she did call 911, he asked her not to give his name because of his warrants. Almost two hours passed between the time when he brought Julian home and when Alvarez called 911. El-Abbadi went to Cabrerra's house, where he smoked marijuana and drank. Early the next morning, after speaking to Detective Escheman on the phone, he went to the police station. He testified that he made up the stories during his interrogation because he did not know what to say to avoid getting into trouble. He denied injuring Julian and stated that had he known what his condition was, he would have taken Julian to the emergency room.

The State cross-examined El-Abbadi regarding his relationship with Alvarez. He testified that it was "somewhat bad" and that he was going to move out.[39] The State also

---

[38] *Id.* at A530 (El-Abbadi Test. at 41:6–8).

[39] *Id.* at A556–57 (El Abbadi Test. at 67:19–68:2).

16

cross-examined El-Abbadi in depth about his statements to Detective Escheman. El-Abbadi admitted to lying multiple times during his police interviews, but he said he was covering for Alvarez.[40] El-Abbadi also admitted to leaving Julian alone in the apartment to retrieve drug paraphernalia from his car, and to smoking marijuana while Julian was in his care. He testified that he also smoked marijuana before his interrogation. At trial, El-Abbadi denied causing the marks on Julian's buttocks, and generally denied causing any injuries to Julian.

### 3. Limitation of Cross-Examination and Testimony Regarding Alverez's Prior Conviction

Dr. Deutsch's testimony is also relevant to El-Abbadi's second issue on appeal regarding limitations to her cross-examination about Alvarez's prior involvement with DFS. On direct examination, the State asked Dr. Deutsch "[s]o prior to your examination of Julian what information specific to him did you learn?"[41] Dr. Deutsch responded:

---

[40] For example, the State asked El-Abbadi "So you are lying to Detective Escheman because you are covering for [Alvarez]?" and El-Abbadi responded "Yes." *Id*. at A570 (El-Abbadi Test. at 81:4–6). Next, the State asked, "you lied about being angry and you lied about spanking him?" *Id.* at A570 (El-Abbadi Test. at 81:20–22). El-Abbadi stated, "Yes." *Id.* The State followed up by asking why he would lie about being angry, and El-Abbadi stated "Like I said, I had worked that day and I got stuck with Julian so I had to reschedule my whole work." *Id.* at A571 (El-Abbadi Test. at 82:3–7). The State asked "do you agree when you told the police that August 20th, that when [Alvarez] left you spanked Julian?" and El-Abbadi responded "By looking at the police report, yes, I said that." *Id.* at A573–74 (El-Abbadi Test. at 84:20-85:1). In another instance, El-Abbadi testified that he had lied about spanking Julian. *Id.* at A596 (El-Abbadi Test. at 107:5–11). The State asked El-Abbadi, "And you are saying here today that [the autobody shop story] was a complete lie?" to which El-Abbadi responded, "Yes, I made multiple statements at the police station." *Id.* at A642 (El-Abbadi Test. at 153:19–22). The State asked the same question regarding the story about the woman in Claymont, that El-Abbadi confirmed was a lie, stating: "Yes, it was. As you see, everything I said to the cops that's not what happened, that's me making multiple, multiple, multiple statements." *Id.* at A645 (El-Abbadi Test. at 156:1–156:3).

[41] *Id*. at A184 (Deutsch Test. at 28:4–5).

So I had some familiarity with Julian, as I had actually previously two years prior assessed him independently in the general pediatric setting. I was Julian's pediatrician, was part of a practice at Nemours where I was called as a general pediatric patient, so I was familiar with some of his past medical history.

I reviewed what was available in the Nemours medical record in the interim time period between my assessment of Julian which was age two and his presentation to Nemours, which notably included a hospital presentation in February of 2019 related to flu symptoms and *concern for supervisory neglect*, so I reviewed that information.

In addition, the emergency department records had been documented by the clinician history that was provided by his mother upon presentation to the hospital.[42]

On cross-examination, defense counsel asked, "[a]nd this wasn't the first time you've had interaction with Julian, correct?"[43] She responded, "that's correct,"[44] at which point the State objected. During the sidebar conversation that followed, the State objected on the grounds of relevance. The defense responded that Dr. Deutsch had brought up Alvarez's previous supervisory neglect charges in her direct testimony. The State informed the trial court that Alvarez had been charged with endangering the welfare of a child and had received probation before judgment for an April 2019 incident. Alvarez had left the children alone while she went to a club in Philadelphia. According to the State, DFS was actively involved in Alvarez's life when Julian was murdered.

Defense counsel argued that the mother denied having caused Julian's injuries and, therefore, it would be relevant if the mother had a pattern of neglect. It was also important

---

[42] *Id.* at A184 (Deutsch Test. at 28:6–23) (emphasis added).

[43] *Id.* at A201 (Deutsch Test. at 45:10–11).

[44] *Id.* (Deutsch Test. at 45:12).

to clarify that El-Abbadi had no role in the prior supervisory neglect allegation. The State sought to distinguish Alvarez's prior neglect charge from the abuse alleged at trial. In sustaining the State's objection, the trial court based its ruling on Delaware Rules of Evidence Rule 401 and Rule 403 ("Rule 401" and "Rule 403"):

> [T]o now inject not physical abuse by the mother in February 19th but simply that she was neglectful because she left the children, not minimizing left the children and went to a club, have that before the jury to sort of extrapolate from that that she could have, one, struck Julian to cause bruising, or two, obviously cause his brain injury when she wasn't present at the time, I think creates an unnecessary level of confusion in 403.
>
> 401 relevance is so broad that arguably you could say it gets in but as I do an analysis under 403, I think it creates more—that it's probative value is less than its – its prejudicial effect is outweighed by any probative value, and again, just for the record, because of the fact that there was an admission in the record by your client that he's responsible for the physical bruising, he's really fighting, as I see it, to say I didn't cause this other trauma, the chassis or engine block, whatever it was that caused the brain injury, so I'm going to sustain that objection.[45]

The trial court also gave the following curative instruction to clarify that Alvarez's DFS involvement did not involve El-Abbadi:

> "Just quickly before we continue, you heard prior testimony from Dr. Deutsch and she had mentioned a prior involvement between herself and Julian Cepeda. That involvement, just to make clear for you and your understanding, had nothing to do with the defendant and the defendant had no responsibility or role in her interaction with Julian Cepeda at that time, that prior incident, ok? All right."[46]

The issue of Alvarez's prior DFS involvement surfaced a second time during El-Abbadi's trial testimony. Counsel for El-Abbadi asked, "so does [Alvarez] ever call, are

---

[45] *Id*. at A208–09 (Deutsch Test. at 52:3–53:1).

[46] *Id*. at A232–33 (Trial Tr. at 76:22–77:7).

you aware when she calls 911?"[47] El-Abbadi testified, "[n]o, she was hesitant to call 911 because she was on probation for a prior conviction with the kids and stuff."[48] The trial court, *sua sponte*, interrupted, "[o]ne second, sir,"[49] at which point the State objected.

At sidebar, the State argued that it had asked defense counsel to instruct El-Abbadi to refrain from testifying about this topic. Defense counsel stated that he told El-Abbadi "the issue is done unless [Alvarez] opens the door and I didn't bring it up. In good faith, I didn't think [Alvarez] had opened the door, so I didn't bring it up."[50] The trial court then took a recess and informed El-Abbadi not to testify about Alvarez's prior DFS encounter. In response, El-Abbadi stated "[w]hat do you call it, I didn't bring this prior neglect or abuse up, Dr. Teeple [sic] did."[51] The trial court responded that it had already ruled on the issue, and that the neglect in that case and the facts in this case were distinct. After the recess, the court asked the jury not to consider that last statement, stating "[a]ll right, ladies and gentlemen, I am going to instruct you to disregard Mr. El-Abaddi's last statement, it has no bearing or is not germane to the issues in this case."[52]

### 4. El-Abbadi's Request for LIO Jury Instructions

After both sides closed their cases, El-Abbadi, having been indicted for MBAN, First Degree, requested LIO instructions for the following offenses: Murder by Abuse or

---

[47] *Id*. at A530 (El-Abbadi Test. at 41:13–14).

[48] *Id*. (El-Abbadi Test. at 41:15–17).

[49] *Id.* (El-Abbadi Test. at 41:18).

[50] *Id*. at A532–33 (El-Abbadi Test. at 43:21–44:1).

[51] *Id*. at A534 (El-Abbadi Test. at 45:12–14).

[52] *Id*. at A537 (El-Abbadi Test. at 48:13–16).

20

Neglect Second Degree ("MBAN, Second Degree"), Manslaughter, and Criminally Negligent Homicide. The State agreed to, and the trial court provided, only the instruction on MBAN, Second Degree.

The State objected to LIO instructions for Manslaughter and Criminally Negligent Homicide. The State argued that there was no evidentiary basis upon which a jury rationally could find El-Abbadi not guilty of MBAN, First Degree, and guilty of Manslaughter, or a basis on which a jury rationally could find him guilty of Criminally Negligent Homicide, but not guilty of MBAN, Second Degree.

El-Abbadi argued that because abuse and neglect are specifically defined within the MBAN, First Degree and MBAN, Second Degree statutes to include particular acts, it would be possible for a jury to find that one of the enumerated acts was not committed, but that he had, nonetheless, committed some reckless or criminally negligent act that would support a finding of guilt for Manslaughter or Criminally Negligent Homicide. When asked to point to a possible scenario in the record, defense counsel argued:

> I think there's the scenario where the jury could believe that the defendant went to discipline the child for a legitimate reason, however had engaged in a reckless or criminally negligent way, like the point of it wasn't abuse of the child.[53]

Defense counsel then stated:

> I am thinking of a scenario where they believe it's possible for them to believe that he caused injury to the child through more of an accident, you know, let's say if there was good faith intention to discipline but then

---

[53] *Id.* at A667 (Trial Tr. at 178:10–15).

something goes awry as opposed to an abuse case where the point is to abuse the kid, like unlawfully or unjustifiably.[54]

When pressed further by the court, defense counsel suggested the following:

I think he wouldn't listen so I struck him. Then at least one of the doctors did testify that the severity of the brain injury that caused the death could have been one blow. And there's other testimony that he's never – he doesn't have his own children, he hasn't been around kids and so the argument would be made that he went to discipline the child but was negligent and the point of it wasn't the abuse that he hit the child for the sake of abuse, but more of negligence.

. . . .

[Manslaughter] would be the same except he was reckless in the actions he took to do something lawful, or I mean, it wasn't for the point of abuse but to discipline the child but he was reckless that caused the death.[55]

The State argued that there was no evidence supporting such scenarios, and even if there were, then it would still be abuse or neglect. After hearing argument from both sides, the court declined to give the Criminally Negligent Homicide and Manslaughter LIO jury instructions. The trial court ruled:

The defendant is entitled to an instruction on a lesser-included offense if the evidence would permit the jury rationally to find him guilty of a lesser included offense and acquit him of a greater. As to the lesser included offense of criminal [sic] negligent homicide and manslaughter, I find that there's no racial [sic] basis in the record to support these two LIOs. The LIO of murder by abuse or neglect second contains the mens rea of criminal negligence. Thus, the only difference between that charge and criminally negligent homicide would be the absence of a finding of abuse or neglect.

Abuse under Title 11, Section 1100 of the Delaware Code is defined as causing injury to a child through unjustified force as defined in Section 468,

---

[54] *Id.* at A669 (Trial Tr. at 180:13–20). El-Abbadi's counsel provided different scenarios in the briefing on appeal. *See* Opening Br. at 19; Reply Br. at 4–5.

[55] App. to Opening Br. at A672, A673 (Trial Tr. at 183:10–21, 184:3–13).

Subsection 1 of the code which includes any act that is likely to cause or does cause physical injury.

Based on the evidence in the record, the jury could either find that the defendant did not commit the alleged act at all, or his actions that lead to Julian Cepeda's injury which was serious physical injury was abuse.

As a result, I am not including the lesser included, the request for the lesser included offense of criminal negligent homicide.

As to manslaughter, the only difference between that charge and murder by abuse first is the component of the victim being a child in murder by abuse first; hence, a finding of murder by abuse first would cover that charge.[56]

The jury began deliberations at about 11:43 a.m. on February 14, 2022, and returned a verdict at about 11:30 a.m. on February 15, 2022. The jury found El-Abbadi guilty of MBAN, First Degree, under the Neglect theory. He was acquitted of the alternate theory of Murder by Abuse, First Degree. On September 23, 2022, the Superior Court sentenced El-Abbadi to thirty years of incarceration at Level V, followed by two years at Level III.[57] This appeal followed.

---

[56] *Id.* at A695–96 (Trial Tr. at 3:13–4:21). El-Abbadi argues that the trial court erred when it concluded that the age of the victim "was the only distinction between the instructed offenses and either Manslaughter or Criminally Negligent Homicide." Opening Br. at 17. Instead, he contends that "[t]he distinction is the breadth of the 'neglect' in which [he] engaged." *Id*. We note that the trial court did acknowledge the additional distinction regarding the breadth of "neglect" as to Criminally Negligent Homicide. The State also acknowledges that "criminally negligent homicide is not limited to acts of abuse or neglect." Answering Br. at 24. And it also acknowledges that "the amount of behavior that [Manslaughter] encompasses is broader than murder by abuse or neglect; it is not limited to acts of abuse or neglect." *Id*. at 23–24. As explained below, we have considered these points and the elements of the relevant statutes, and we affirm after examining the issues and the record *de novo*.

[57] The first fifteen years of the sentence are mandatory.

## III. CONTENTIONS ON APPEAL

El-Abbadi raises two issues on appeal. First, El-Abbadi contends that trial court erred as a matter of law by denying his request for instructions on the LIOs of Manslaughter and Criminally Negligent Homicide. Second, he contends that the trial court violated his rights to confrontation, cross-examination, and to present a complete defense when it precluded cross-examination and testimony regarding Alvarez's prior neglect case.

## IV. ANALYSIS

### A. Whether Trial Court Erred by Refusing to Provide Manslaughter and Criminally Negligent Homicide Jury Instructions

El-Abbadi argues that there was a rational basis for the jury to convict him of the lesser included offenses and not the offense charged. We explained in *Wright v. State*,[58] that where a trial court is asked to give a jury instruction in a criminal case, the trial court must determine:

> (1) that the defense or lesser included offense for which the instruction is requested could apply as matter of law; (2) that the evidence presented meets the statutory requirements to entitle the defendant to the requested instruction; and (3) whether the particular form, content, or language of the instruction proposed by the defendant represents a correct statement of the law."[59]

"To perform the first two steps of the analysis, a trial court must look at the relevant statutory provisions governing the availability of the instructions."[60] Where a trial court

---

[58] 953 A.2d 144 (Del. 2008).

[59] *Wright v. State*, 953 A.2d 144, 147 (Del. 2008). *See also Cseh v. State*, 947 A.2d 1112, 1113–14 (Del. 2008).

[60] *Wright*, 953 A.2d at 147.

has held that the requested instruction is unavailable under the relevant statute, this Court analyzes whether the trial court properly applied the relevant statutory provision to the facts at hand.[61] We analyze a refusal to provide a LIO instruction *de novo*.[62]

### 1. *When a Trial Court May Issue a LIO Instruction Under Delaware Law*

We turn to El-Abbadi's specific contention that the trial court erred when it declined to give the LIO jury instructions for Manslaughter and Criminally Negligent Homicide. 11 *Del. C.* § 206(b) defines an offense as a LIO of another offense when:

(1) It is established by the proof of the same or less than all the facts required to establish the commission of the offense charged; or

(2) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or

(3) It involves the same result but differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest or a lesser kind of culpability suffices to establish its commission.[63]

Under 11 *Del. C.* § 206(c), trial courts must provide an LIO instruction when the evidence supports such a charge:

(c) The court is not obligated to charge the jury with respect to an included offense *unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense*.[64]

---

[61] *Id.* at 148.

[62] *Cseh*, 947 A.2d at 1113.

[63] 11 *Del. C.* § 206(b).

[64] 11 *Del. C.* § 206(c) (emphasis added).

In construing this statutory provision, this Court has observed that as a matter of Due Process under the United States Constitution and Delaware law, "the court must instruct the jury on an included offense if 'there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense.'"[65]

In *Cseh v. State*, we stated that a trial judge should grant the request for the LIO instructions if the defendant meets the following four criteria:

> (1) the defendant makes a proper request; (2) the lesser included offense contains some but not all of the elements of the charged offense; (3) the elements differentiating the two offenses must be in dispute; and (4) there must be some evidence that would allow the jury rationally to acquit the defendant on the greater charge and convict on the lesser charge.[66]

If this test is satisfied, then the second step of *Wright* is also satisfied.[67] The parties have agreed as a general matter, in their briefing and argument before this Court, that Manslaughter and Criminally Negligent Homicide could be LIOs of MBAN, First Degree and MBAN, Second Degree. Therefore, we focus on their more narrowly centered dispute—whether there was some evidence that would have allowed the jury rationally to

---

[65] *Cseh*, 947 A.2d at 1114 (quoting 11 *Del. C.* § 206(c)); *see also Capano v. State*, 781 A.2d 556, 633–34 (Del. 2001) ("The relevant Delaware statute simply states that the trial judge 'is not obligated' to charge on lesser included offenses unless the rational basis test is met."). We have recognized that providing the jury with the option of convicting on a lesser included offense ensures that the jury will accord the defendant the full benefit of the reasonable doubt standard. *Bentley v. State*, 930 A.2d 866, 875 (Del. 2007) (citing *Beck v. Alabama*, 447 U.S. 625, 634 (1980)).

[66] *Cseh*, 947 A.2d at 1114 (citing *Henry v. State*, 805 A.2d 860, 864 (Del. 2002) and *Bentley*, 930 A.2d at 875).

[67] *Cseh*, 947 A.2d at 1114.

acquit El-Abbadi of MBAN, First Degree and MBAN, Second Degree, and instead, to convict him of Manslaughter or Criminally Negligent Homicide.

Under this "rational basis" test, "some evidence" is construed broadly. This Court has held that defendants are entitled to LIO instructions where there is "*any evidence fairly tending to bear* upon the lesser included offense, however weak that evidence may be."[68] To put the evidence in the proper framework, we next review the elements of the relevant criminal statutes.

### 2. Elements of the Relevant Charges

The elements of MBAN, First Degree, a class A felony, are set forth in 11 *Del. C.* § 634. They are: (1) a person recklessly causes the death of a child through (2) an act of abuse and/or neglect; or when the person has engaged in a previous pattern of abuse and/or neglect of such child.[69] A person acts "recklessly" when a person:

> [I]s aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from the conduct. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto.[70]

Both "abuse" and "neglect" are defined terms. "Abuse" "means causing any physical injury to a child through unjustified force as defined in § 468(1)(c) of this title,

---

[68] *Henry*, 805 A.2d at 865 (emphasis added) (citation omitted).

[69] 11 *Del. C.* § 634(a).

[70] 11 *Del. C.* § 231(e).

27

torture, negligent treatment, sexual abuse, exploitation, maltreatment, mistreatment or any means other than accident."[71]  "Neglect" occurs when a person:

a.  Is responsible for the care, custody, and/or control of the child; and

b.  Has the ability and financial means to provide for the care of the child; and

> 1.  Fails to provide necessary care with regard to: food, clothing, shelter, education, health, medical or other care necessary for the child's emotional, physical, or mental health, or safety and general well-being; or
>
> 2.  Chronically and severely abuses alcohol or a controlled substance, is not active in treatment for such abuse, and the abuse threatens the child's ability to receive care necessary for that child's safety and general well-being; or
>
> 3.  Fails to provide necessary supervision appropriate for a child when the child is unable to care for that child's own basic needs or safety, after considering such factors as the child's age, mental ability, physical condition, the length of the caretaker's absence, and the context of the child's environment.[72]

In order to find El-Abbadi guilty of MBAN, First Degree, the jury was required to unanimously agree on the method, abuse, neglect, or both, by which this statute was

---

[71] 11 *Del. C.* § 1100(1).  "Unjustified force" under 11 *Del. C.* § 468(1)(c) includes, but is not limited to, any of the following:

> Throwing the child, kicking, burning, cutting, striking with a closed fist, interfering with breathing, use of or threatened use of a deadly weapon, prolonged deprivation of sustenance or medication, or doing any other act that is likely to cause or does cause physical injury, disfigurement, mental distress, unnecessary degradation or substantial risk of serious physical injury or death[.]

11 *Del. C.* § 468(1)(c).

[72] 10 *Del. C.* § 901(18).  The State relies primarily on 10 *Del. C.* § 901(18)(b)(1).

violated.  In this case, the jury convicted El-Abbadi of Murder by Neglect, First Degree and acquitted him of Murder by Abuse, First Degree.

The only difference between MBAN, First Degree and MBAN, Second Degree, a class B felony, is the requisite *mens rea*.  MBAN, Second Degree, defined in 11 *Del. C.* § 633, provides that a person is guilty of this offense when with criminal negligence, the person causes the death of a child through an act of abuse and/or neglect of such child; or when the person has engaged in a previous pattern of abuse and/or neglect of such child.[73]

Criminal negligence occurs when a person "fails to perceive a risk that the element exists or will result from the conduct.  The risk must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."[74]  Criminal negligence is distinct from ordinary negligence, which requires that a person "fails to exercise the standard of care which a reasonable person would observe in the situation."[75]

Manslaughter, a class B felony, defined in 11 *Del. C.* § 632(1), requires that a person recklessly causes the death of another person.[76]  This statute does not contain abuse or neglect as an element, and it does not require that the victim be a child.  Similarly, Criminally Negligent Homicide, a class D felony, is defined in 11 *Del. C.* § 631 and

---

[73] 11 *Del. C.* § 633(a).

[74] 11 *Del. C.* § 231(a).

[75] 11 *Del. C.* § 231(d).

[76] 11 *Del. C.* § 632(1).

provides that a person is guilty of this offense when, with criminal negligence, the person causes the death of another person.[77]

As noted above, the parties have agreed that Manslaughter and Criminally Negligent Homicide could be LIOs of MBAN, First Degree or MBAN, Second Degree.[78] All four of these charges require that a defendant cause the death of another person. MBAN, First Degree and Manslaughter require that the death is caused by reckless conduct. MBAN, Second Degree and Criminally Negligent Homicide require that the death is caused by criminally negligent conduct. The charges differ in that MBAN, First Degree and MBAN, Second Degree require that victim to be a child and both more narrowly define the requisite reckless or criminal negligent conduct as "abuse" or "neglect."

In order to satisfy the test for an LIO, there must be some evidence that El-Abbadi engaged in some reckless or criminally negligent conduct that is outside the boundaries of

---

[77] 11 *Del. C.* § 631.

[78] At Oral Argument, the Court asked:

> Q. To confirm, you're you're [sic] not arguing that these charges could never be lesser included offenses of the indicted charge of murder by abuse or neglect first degree?

> A. That's correct. I, um, struggle to come up with a situation where that might be the case, you know, maybe like a car accident or, um, I know in the *Handy* case there was the, um, caregiver who gave the child, uh, Benadryl and he overdosed on Benadryl. Um, but that, I mean that issue and there were the lesser included charges given in that case, but that case is distinguishable from this one.

Supreme Court of the State of Delaware, *2023-10-5 364, 2022 El-Abbadi v. State*, Vimeo, at 25:35–26:18 (Oct. 25, 2023, 11:52 a.m.), https://vimeo.com/877929345. *See also State v. Handy*, 2019 WL 3976583, at *2 (Del. Super. Ct. Aug. 20, 2019) (MBAN, First Degree case in which the state alleges a day care caretaker worker caused a child to overdose on Benadryl; manslaughter, MBAN, Second Degree, and Criminally Negligent Homicide lesser included offense instructions were given.).

30

the more narrowly defined "abuse" or "neglect" categories. We are mindful that "it is well settled that "'the jury is the sole judge of [the] credibility of the witnesses and responsible for resolving conflicts in the testimony.'"[79]

3.   *There is No Evidence that Would Allow a Jury Rationally to Acquit El-Abbadi of Murder by Abuse or Neglect and Convict El-Abbadi of Manslaughter or Criminally Negligent Homicide*

We now turn to the question of whether there was any evidence that would allow the jury *rationally* to acquit El-Abbadi of MBAN, First Degree or MBAN, Second Degree, and instead convict him of Manslaughter or Criminally Negligent Homicide. We agree with the trial court's conclusion that there was no evidence that showed reckless or criminally negligent conduct that did not also constitute abuse or neglect.

The State's theory was that El-Abbadi acted recklessly and caused Julian's death either by injuring Julian in a manner that constituted abuse, or alternatively, that El-Abbadi was responsible for Julian's care, had the ability and financial means to care for him, and failed to provide the necessary care with regard to his physical health or safety and general well-being. The LIO instruction of MBAN, Second Degree allowed the jury to consider whether El-Abbadi acted in accordance with either of these two theories but acted with criminal negligence rather than recklessness.

The State argues further that on the facts and evidence presented in this case, there was no "set of circumstances pursuant to which a rational jury could have found that El-

---

[79] *Rivera v. State*, 292 A.3d 111, 2023 WL 1978878, at *8 (Del. Feb. 13, 2023) (quoting *Tyre v. State*, 412 A.2d 326, 330 (Del. 1980)). *See also Henry*, 805 A.2d at 865 (stating that "[i]n ruling upon a request to instruct the jury on a lesser included offense, the trial judge 'must give full credence to [the] defendant's testimony.'" (citation omitted)).

Abbadi did not commit an act of abuse or neglect but was still guilty of criminally negligent homicide or manslaughter."[80]  This is because, according to the State:

> If the jury accepted any one of El-Abbadi's versions of events—that Julian ran into a chassis machine in the autobody shop; that another person (the woman in Claymont, "Jeffe [sic]," or Alvarez) caused the head injury; that someone he knew hit Julian with a car; or that he accidentally hit Julian too hard with a pillow, causing him to fly across the room and hit his head—it would have had to either find him guilty of murder by abuse or neglect or not guilty of any crime.  If the jurors believed that someone else caused Julian's head injury or that Julian was accidentally injured when he ran into the chassis machine, they would have had to have found El-Abbadi guilty of either murder by *neglect* first or second degree or acquitted him of any crime.[81]

In response El-Abbadi offered into evidence his testimony regarding his conduct that day.  His theories at trial were that 1) the injury occurred during Alvarez's care before he took care of Julian and he simply did not know the extent of his injury required significant and emergent medical attention and 2) any injury exacerbated by the delay of care occurred during the hour and a half during which Alvarez delayed calling for medical assistance immediately upon his return with Julian.[82]  At trial, he denied hitting and

---

[80] Answering Br. at 24.

[81] *Id*. at 24–25 (emphasis in original).

[82] Opening Br. at 19.  This theory was elaborated in El-Abbadi's Reply Brief on appeal:

> [G]iven the evidence regarding Alverez [sic]'s conduct and anger towards Julian over the weekend and on the morning before she left him with El-Abbadi, a jury could have rationally concluded, for example, either: 1) Julian's injuries occurred prior to or while he was in Alverez's [sic] care, custody and/or control and that El-Abbadi was unaware that the injuries, leading to the progressively worsening condition, required more medical attention than his administration of ibuprofen or other medicine to Julian; or 2) any delay in treatment that doctors testified contributed to Julian's death was the result of Alverez's [sic] neglect after El-Abbadi returned Julian to her care, custody and/or control.  In either of these cases, a jury could find that El-Abbadi's conduct did not fit the "narrow" definition of negligence [sic] but that he did not exercise the standard of care which a reasonable person would observe in the situation or that he failed to perceive a risk "that the

otherwise abusing or neglecting Julian and denied having the knowledge and ability to know the extent of Julian's injuries while in his care.

By arguing that he did not hit Julian and that Alvarez caused Julian's injuries, El-Abbadi denies committing abuse. By arguing that he could not have known the extent of the injuries, El-Abbadi argues that he could not have acted recklessly because he did not consciously disregard a substantial and unjustifiable risk. By denying that the delay of care for Julian was his fault, El-Abbadi denies that he failed to provide the necessary care for Julian who was in his control, and therefore he argues he did not neglect Julian. By arguing that he did not know that Julian required immediate medical attention, he also argues that he was not criminally negligent. According to El-Abbadi, his lack of perception of the risk regarding Julian's injuries was not a gross deviation from the standard of conduct that a reasonable person would observe in the situation, and thus, he argues that he was not criminally negligent.

To find El-Abbadi guilty of Manslaughter instead of MBAN, First Degree, there would need to be *some evidence fairly* showing that El-Abbadi engaged in reckless behavior that did not constitute abuse or neglect as those terms have been defined. However, El-Abbadi denies hitting Julian and he denies having knowledge of his condition and consciously disregarding it. Therefore, El-Abbadi argues that he did not act recklessly

---

element exists or will result from his conduct" and that failure was a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

Reply Br. at 4–5.

33

at all. Rather, he claims that he was not aware of, and did not consciously disregard a substantial and unjustifiable risk. If the jury were to believe his testimony, they would have to reject the *mens rea* of recklessness and find him not guilty. If the jury rejects the *mens rea* of recklessness, they reject the requisite *mens rea* for both MBAN, First Degree, and Manslaughter.

Similarly, in order to find that El-Abbadi was guilty of Criminally Negligent Homicide instead of Murder by Abuse or Neglect Second Degree, there would need to be *some* evidence fairly showing that El-Abbadi engaged in criminally negligent behavior that did not rise to the conduct statutorily-defined as abuse or neglect. Here, El-Abbadi denies that he committed any of the acts constituting neglect or abuse because he denies hitting Julian and he denies having any knowledge of the Julian's deteriorating medical condition. According to El-Abbadi, because Alvarez herself was unaware of the extent of the injury and delayed care when El-Abbadi returned with Julian, his failure to perceive the risk does not constitute a gross deviation from the standard of conduct a reasonable person would have observed in his situation. Because he denies that he was criminally negligent, if the jury were to believe him, they would reject the *mens rea* of criminal negligence. By doing so, the jury would reject the requisite *mens rea* for both MBAN, Second Degree and Criminally Negligent Homicide.

But then there are the various stories El-Abbadi told during his police interviews. The State entered El-Abbadi's recorded interrogations into evidence, allowing the jury to consider El-Abbadi's alternative theories about how Julian sustained his injuries: Julian hit his head at the autobody shop, Julian got hurt at a friend's house, Julian was injured at

34

a confrontation with another person, and Julian was injured in a pillow fight by hitting his head on the floor. At trial, El-Abbadi admitted that these stories were lies. If the jury, nonetheless, decided that one of these theories was the truth, any one of these theories would still constitute a failure to provide supervision or medical care for Julian's general safety, health, and well-being. In other words, El-Abbadi's behavior constituted neglect. A jury rationally could have found abuse if they had believed any version in which El-Abbadi struck Julian, including in a pillow fight causing Julian to fly across the room and hit his head.[83] There was no dispute that Julian suffered a severe head injury inflicted by a large amount of force. Thus, the only issue in dispute was whether El-Abbadi hit Julian with recklessness or criminal negligence.

If the jurors believed that someone else caused Julian's head injury or that Julian was injured accidentally when he ran into the chassis machine, they would have had to have found El-Abbadi guilty of either Murder by Neglect (First or Second Degree) or would have to have acquitted him of any crime. Even crediting his various stories, there was no dispute that El-Abbadi was "responsible for the care, custody and/or control" of Julian, that he had the ability and means to provide for Julian, and that he did not provide the necessary medical care for him.[84]

---

[83] As noted above, the definition of "abuse" includes "causing any physical injury to a child through unjustified force as defined in § 468(1)(c) of this title . . . or any means other than accident." 11 *Del. C.* § 1100(1).

[84] 10 *Del. C.* § 901(18) (definition of "Neglect").

In conclusion, there was no evidence that would have allowed the jury rationally to find El-Abbadi not guilty of the instructed charges, MBAN, First Degree and MBAN, Second Degree, and instead, guilty of Manslaughter or Criminally Negligent Homicide. In other words, there was no evidence that rationally allowed the jury to find that El-Abbadi acted recklessly or with criminal negligence but not with abuse or neglect. Accordingly, the trial court did not err in declining to provide the requested LIO instructions for Manslaughter and Criminally Negligent Homicide.

### B. Whether the Trial Court Erred by Limiting Cross-Examination and Testimony Regarding Alvarez's Prior Neglect Case

#### 1. Contentions on Appeal

El-Abbadi argues that the trial court erred by improperly limiting his cross-examination of Dr. Deutsch and his testimony, and as a result, he was unable to explain why Alvarez delayed obtaining treatment for Julian once he arrived home on the evening of August 19. He argues that Alvarez hesitated to call 911 because of her prior involvement with DFS, and that the jury rationally could have concluded that Alvarez's delay after El-Abbadi returned Julian to her care, deprived Julian of the medical treatment he needed.[85] Thus, by not permitting him to present this testimony, he asserts that the court violated his Due Process rights by compromising his right to present a complete defense.[86]

---

[85] He argues that his two arguments on appeal must be read *in pari materia* and that "[h]ad the proper lesser included offense instructions been provided, a rational trier of fact could have acquitted El-Abbadi of Murder by Neglect First or Second and, instead, convicted him of Manslaughter or Criminally Negligent Homicide based on a reduced level of *mens rea*." Reply Br. at 8.

[86] *See, e.g., Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (observing that the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense, but also

In framing his argument on appeal, El-Abbadi argues that his Confrontation Clause rights were violated when the trial court restricted this testimony. He cites to the Fourth Amendment of the United States Constitution and Article I, § 7 of the Delaware Constitution for Confrontation Clause protections.[87] The Confrontation Clause of the Sixth Amendment provides the accused the right "to be confronted with the witnesses against him,"[88] and it requires an adequate opportunity to examine adverse witnesses.[89]

The State counters that the trial court correctly applied Rules 401 and 403 in concluding that the prior neglect and abuse before the court were distinct and that the testimony had the potential to confuse the jury. The State also argues that El-Abbadi did not raise his constitutional arguments below and that he cannot demonstrate that the trial court committed plain error.

2. *The Trial Court Did Not Abuse Its Discretion or Commit Plain Error*

The trial court initially addressed this issue by applying Rules 401 and 403 because that is how the issue was framed by the parties at the time. The trial court did not abuse its discretion when it sustained the State's objection to the cross-examination of Dr. Deutsch

---

recognizing that state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials) (citations and quotations omitted).

[87] El-Abbadi makes no argument pertaining to Article I, § 7, and thus, this Opinion does not address Article I, § 7 of the Delaware Constitution.

[88] U.S. Const. amend. VI. *See also McCrary v. State*, 290 A.3d 442, 451 (Del. 2023) (admission of out-of-court testimonial statements into evidence does not violate Confrontation Clause when minor victim was available for cross-examination despite her limited recall).

[89] *See, e.g.*, *McCrary*, 290 A.3d at 451–53.

regarding Alverez's prior conviction. Nor did it abuse its discretion by restricting El-Abbadi's testimony on the same topic.[90]

Under Rule 401, evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[91] Under Rule 403, a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[92]

El-Abbadi acknowledges in his opening brief that his trial counsel had no intention of delving into Alvarez's record.[93] When the issue first arose during Dr. Deutsch's direct examination, he did not argue below, as he now argues on appeal, that the testimony was relevant to show that he had urged Alvarez to call 911 but that she hesitated due to her prior

---

[90] Any challenge to the trial judge's application of Rules 401 and 403 would be reviewed under our abuse of discretion standard. *See Harris v. State*, 301 A.3d 1175, 1180 (Del. 2023) ("This Court reviews 'a trial court's decision on the admissibility of evidence under an abuse of discretion standard.'") (citations omitted); *Brown v. State*, 117 A.3d 568, 578–79 (Del. 2015) ("We review trial court rulings on the admissibility of evidence for abuse of discretion"). We will not overturn a defendant's conviction under the abuse of discretion standard unless the trial court affected a substantial right of the defendant by acting in "an arbitrary and capricious manner." *McGee v. State*, 586 A.2d 1202, 1990 WL 254349, at *1 (Del. Dec. 11, 1990) (TABLE). *See also Wright v. State*, 25 A.3d 747, 752 (Del. 2011) ("'An abuse of discretion occurs when a court has exceeded the bounds of reason in view of the circumstances, or so ignored recognized rules of law or practice to produce injustice.'" (quoting *Floudiotis v. State,* 726 A.2d 1196, 1202 (Del.1999))).

[91] D.R.E. 401.

[92] D.R.E. 403.

[93] Opening Br. at 22 (stating that "Defense counsel explained that he had no intention of delving into Alvarez's record," and that "[r]ather, the State opened the door as to Deutsch's prior assessment of Julian and he sought to cross examine her on that specific testimony.").

involvement with DFS. Rather, he argued to the trial court that the testimony would be relevant if Alvarez had a "pattern of neglect" because she had denied causing Julian's injuries. At this point in the trial, the court, after hearing from both sides, addressed the matter. The trial court properly ruled that the probative value was less than the potential prejudice that might arise from having the "jury to sort of extrapolate from that that she could have one, struck Julian to cause bruising, or two, obviously cause his brain injury when she wasn't present at the time."[94] The court later gave a limiting instruction to clarify that the prior involvement with DFS referenced in Dr. Deutsch's earlier testimony "had nothing to do with the defendant and the defendant had no responsibility or role in her interaction with Julian Cepeda at that time."[95] In discussing the instruction with counsel before it was given, El-Abbadi's counsel said he was "good with that."[96] No further objections were raised.

The issue arose again during El-Abbadi's testimony when El-Abbadi testified that Alvarez was hesitant to call 911 because she was on probation. Although the court previously had ruled on the issue based upon his other theories of relevance asserted during Dr. Deutsch's testimony, this was arguably a different theory. Nevertheless, his counsel did not assert a new objection, but rather, stated, "the issue is done unless [Alvarez] opens

---

[94] App. to Opening Br. at A208–09 (Deutsch Test. at 52:7–10).

[95] *Id.* at A233 (Trial Tr. at 77:3–6).

[96] *Id.* at A232 (Trial Tr. at 76:2).

the door and I didn't bring it up,"[97] and that he did not think Alvarez had brought it up. Counsel did not press it further.

The trial court did not err in adhering to its prior ruling that although it may have been relevant, cross-examination and testimony from Dr. Deutsch and El-Abbadi regarding Alvarez's prior conviction was more prejudicial than it was probative. El-Abbadi had other ways and other opportunities to establish that Alvarez delayed calling 911 that did not require confusing the issues between Alvarez's prior neglect charge and the alleged abuse and neglect in the case before the jury. He did cross-examine Alvarez about the hour and a half delay between the time she returned home and the time she called 911. For example, El-Abbadi's counsel engaged in the following exchange with Alvarez during his cross-examination of her:

> Q.  If you had been aware of his condition, how severe his condition was, you would have called 911, correct?
>
> A.  Yes.
>
> Q.  But from — when did you eventually get on the line with 911?
>
> A.  It might have been an hour later.[98]
>
> . . . .
>
> Q.  Was it more like around 8 o'clock correct?
>
> A.  Well, that, about that.
>
> Q.  It was about 8 o'clock and Julian came home about 6:20?

---

[97] *Id.* at A532–33 (El-Abbadi Test. at 43:21–44:1).

[98] *Id.* at A480 (Alvarez Test. at 128:9–15).

40

A. Yes.[99]

The State followed-up on the subject of Alvarez's delay during her re-direct examination:

Q. Mr. Wilkinson asked you about why it was that you didn't call 911 right away, did you believe what Taha told you about what happened with Julian?

A. Yes.

Q. And did you believe at that time that he had been given sleeping medicine?

A. Yes.

. . . .

Q. The phone call you placed to Krista Hsu, your friend Krista Hsu, that was before you spoke to the pediatrician?

A. Yes.

Q. In fact, you tried to call the pediatrician several times before you were ultimately able to get a live person on the phone, isn't that correct?

A. Yes.[100]

El-Abbadi's counsel did not follow-up with any re-cross examination. His counsel also examined Alvarez about her phone call with Ms. Hsu. Alvarez said that Hsu advised her to call the pediatrician and so Alvarez decided to do that. She discussed her intentions with El-Abbadi who told her that Julian would be fine and that he did not want her to call the doctor "[b]ecause he thought he was going to get into trouble."[101] But Alvarez decided

---

[99] *Id.* (Alvarez Test. at 128:18–22).

[100] *Id.* at A485–86 (Alvarez Test. at 133:9–16; 133:20–134:4).

[101] *Id.* at A458 (Alvarez Test. at 106:12–13).

to call anyway. As the State points out, El-Abbadi has not argued on appeal that the trial court improperly restricted his examination of Alvarez.[102]

During the trial, El-Abbadi testified that "almost two hours" elapsed between the time he returned with Julian and when Alvarez called 911.[103] He denied that he told Alvarez not to seek medical care.[104] He testified that he told her to call the hospital and 911. When asked why he did not call 911, he said that he "had [a] warrant for [his] arrest for a drug case pending and warrants for car tickets."[105] He said that had he known Julian's condition was that severe, he would have taken Julian "to the hospital from the shop."[106] He also admitted to lying to the trauma surgeon about how Julian was injured but said that Alvarez had told him to lie. He said that she made up that story because she did not "want to get in trouble."[107] He said that he made up all of the lies during his interview to save Alvarez. Thus, El-Abbadi was not prevented from testifying about Alvarez's delay in calling 911 or from asserting that she was responsible for Julian's death.

Based upon our review of the record, we are satisfied that the exclusion of testimony regarding Alvarez's prior neglect charge was neither an abuse of discretion, nor plain error.

---

[102] El-Abbadi responds in his reply brief that the trial court, three days earlier, had prevented him from cross examining Dr. Deutsch. Thus, the court had already ruled on this before Alvarez testified. Reply Br. at 8–9.

[103] App. to Opening Br. at A539 (El-Abbadi Test. at 50:15). As noted above, the record shows that on August 19, 2019, El-Abbadi was responsible for the care of Julian and that Alvarez was not physically with Julian from 7:40 a.m. to 6:15 p.m.

[104] *Id.* at A543 (El-Abbadi Test. at 54:14–16).

[105] *Id.* at A634 (El-Abbadi Test. at 145:5–6).

[106] *Id*. (El-Abbadi Test. at 145:22–23).

[107] *Id.* at A642 (El-Abbadi Test. at 153:9).

A plain error is "[']so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process . . . [and is a] material defec[t] which [is] apparent on the face of the record [and is] basic, serious and fundamental. . . .'"[108]  Although cross-examination is an integral part of a defendant's Sixth Amendment rights, the Confrontation Clause of the Sixth Amendment is not unbounded.[109]  For example, the United States Supreme Court has recognized that "it does not follow . . . that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness."[110]  Rather, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."[111]  Moreover, "'the Confrontation Clause

---

[108] *Williams v. State*, 796 A.2d 1281, 1284 (Del. 2002) (alterations in original) (quoting *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986)).

[109] *See, e.g., United States v. Lawrence*, 349 F.3d 109, 119–120 (3d Cir. 2003).  In *Lawrence*, the United States Court of Appeals for the Third Circuit observed:

> The Sixth Amendment guarantees a defendant's right to confront witnesses.  Cross-examination is an integral part of that right and concomitantly, it is an important ingredient in the fact-finding process.  Accordingly, significant restrictions on a defendant's cross-examination of witnesses can amount to a violation of rights guaranteed under the Sixth Amendment.  However, the right to cross-examine is neither absolute nor unbounded.  Rather, it is tempered by the practical aspects of conducting a criminal trial and a reasonable limitation on cross-examination will [therefore] not necessarily violate the Sixth Amendment.

*Id*. (citations and quotations omitted).

[110] *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

[111] *Id*.  *See also Government of Virgin Islands v. Mills*, 956 F.2d 443, 446 (3d Cir. 1992) (observing that "[t]he Sixth Amendment requires more than a mere showing by the accused that some relevant

guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"[112]

The State claims that the challenged limitations do not rise to a Due Process or Confrontation Clause violation because the excluded testimony was neither exculpatory nor material. It contends that El-Abbadi's theory that the prior incident exhibited a pattern of neglect, and that Alvarez caused the injury, was "simply too far removed from the facts of the case."[113] The State asserts the "crux" of El-Abbadi's defense was that Alvarez caused the injury before leaving Julian with El-Abbadi and that the injury was not obvious. Therefore, the State claims that her prior neglect charge was immaterial to the defense.

We are satisfied that the trial court's exclusion of the challenged cross-examination does not constitute plain error. Alvarez's prior DFS involvement was distinct from the facts presented. Further, the witnesses were questioned about the delay and the impact that delay had on Julian's condition. El-Abbadi's counsel did cross-examine Alvarez about the hour and a half period in which she did not call for medical assistance. Counsel also examined Ms. Hsu about Alvarez's delay, and the medical staff about the impact of any such delay.

---

evidence was excluded from his trial. Rather, the accused must show how the testimony would have been both *material* and *favorable* to his defense.") (emphasis in original).

[112] *McCrary*, 290 A.3d at 452 (emphasis in original) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (citing *Ohio v. Roberts*, 448 U.S. 56, 72 n.12 (1980), *abrogated by Crawford v Washington*, 541 U.S. 36, 68 (2004)). As we observed in *Banther v. State*, "*Crawford* restricts the use of prior 'testimonial' out-of-court statements of unavailable declarants." 977 A.2d 870, 888 (Del. 2009). In so holding, *Crawford* abrogated *Ohio v. Roberts*, 448 U.S. 56 (1980) with regard to "testimonial" out-of-court statements of non-appearing declarants. Nevertheless, we continue to adhere to the general proposition quoted above as indicated by our reference to it recently in *McCrary* which notes the abrogation of *Roberts* by *Crawford*. *See McCrary*, 290 A.3d at 452, n.58.

[113] Answering Br. at 32.

El-Abbadi testified that Alvarez delayed seeking medical care and he argued that the delay injured Julian. El-Abbadi was not prevented from testifying and arguing that Alvarez was responsible for Julian's death. Preventing him from eliciting a specific reason as to why Alvarez might have been reluctant to call 911 does not rise to the level of plain error on the record before us.

Thus, we reject El-Abbadi's new argument on appeal that his inability to elicit testimony about Alvarez's prior neglect charge deprived him of his Sixth Amendment and Due Process rights. Even if the limitation were error, it was not so clearly prejudicial as to jeopardize the fairness and integrity of the trial process.

## V. CONCLUSION

For the reasons stated above, we AFFIRM the conviction.